[No. S123074. Dec. 29, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JARMAAL LARONDE SMITH, Defendant and Appellant.

## COUNSEL

Gregory Marshall, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, Robert R. Anderson, Chief Assistant Attorney General, Mary Jo Graves, Assistant Attorney General, Janis Shank McLean, Janet E. Neeley, Stephen G. Herndon and Rachelle A. Newcomb, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BAXTER, J.**—The defendant in this case challenges the sufficiency of the evidence to support his conviction of two counts of attempted murder where he fired a single bullet into a slowly moving vehicle, narrowly missing a mother and her infant son. The evidence showed that the mother, who was known to defendant and was driving, and her baby, who was secured in a car seat directly behind her, were each in defendant's line of fire when he fired a single .38-caliber round at them from behind the car as it pulled away from the curb. The bullet shattered the rear windshield, narrowly missed both the mother and baby, passed through the mother's headrest, and lodged in the driver's side door.

On appeal, defendant contends his conviction of the attempted murder of the baby must be reversed for lack of substantial evidence that he harbored the requisite specific intent to kill the child. We disagree. Under the applicable deferential standard of review, we conclude the evidence is sufficient to support the jury's verdict finding defendant acted with intent to kill the baby as well as the mother. The fact that only a single bullet was fired into the vehicle does not, as a matter of law, compel a different conclusion. Accordingly, the judgment of the Court of Appeal shall be affirmed.

### FACTS AND PROCEDURAL BACKGROUND

On the afternoon of February 18, 2000, Karen A. drove her boyfriend, Renell T., Sr. (Renell), to a friend's house on Greenholme Lane in Sacramento. She was driving her four-door Chevy Lumina, with Renell seated in

the front passenger seat and their three-month-old baby, Renell T., Jr., secured in a rear-facing infant car seat in the backseat directly behind her. She parked alongside the curb on the street in front of the house, and Renell got out of the car. As Karen waited in the car to make sure Renell's friend was home, she saw defendant approaching from behind. Karen recognized defendant as a former friend. She had last spoken to him during a telephone conversation eight to nine months earlier during which he had told her the next time he saw her he would "slap the shit out of [her]."

Defendant walked up to the open front passenger window of Karen's car, looked inside and said, "Don't I know you, bitch?" Overhearing the statement, Renell turned around from the walkway leading to the house and said, "Well, you don't know me." As Renell walked back toward the car, defendant lifted his shirt to display a handgun tucked in his waistband. Renell said, "It is cool," and backed away from defendant. According to Karen, a group of men on the street corner began approaching the car, and as Renell was entering the vehicle through the front passenger door, defendant and the other men began hitting him.

As soon as Renell was securely inside the car, Karen started to pull away from the curb. After driving about one car length, she looked in her rearview mirror and saw defendant standing "[s]traight behind" her holding a gun. She heard a single gunshot, and although she did not see defendant pull the trigger, he was the only person she had seen with a gun. The bullet shattered the rear windshield, narrowly missed both Karen and the baby, passed through the driver's headrest, and lodged in the driver's side door. As soon as Karen reached a place of safety, she stopped to check the baby for injuries. He was screaming, his face covered with pieces of broken glass.

Renell's testimony generally corroborated Karen's testimony. He declined to identify defendant as the assailant because he did not want to be a snitch, but identified the assailant's gun as a .38-caliber revolver. After the shooting, a Sacramento County deputy sheriff searched defendant's room at his mother's home and recovered two .38-caliber shell casings.

Defendant testified he was unarmed on the day of the shooting, and that it was Renell who had displayed a gun during the confrontation. He claimed that Karen was his ex-girlfriend and that he had spoken to her over the telephone the day before the shooting. During this conversation, defendant told Karen the next time he saw her he would "slap the shit out of [her]." Karen hung up, and then Renell called back and threatened to "smoke" defendant. Defendant suggested he and Renell meet on Greenholme Lane the next day. When Renell arrived at the agreed location with Karen and the baby, defendant approached the car, saw Karen and the baby inside, and said,

"What are you doing here, bitch?" Renell got out of the car, and defendant challenged him to a fistfight. Renell responded by pulling a semiautomatic handgun from his waistband. Although Renell did not fire, defendant heard a shot, hit the ground, heard several more shots and heard glass shattering. Defendant saw two .38-caliber casings lying on the ground, picked them up, put them in his pocket and brought them to his mother's house.

Defendant was charged by information with the attempted murder of Karen A. (Pen. Code, §§ 664, 187—count I),[1] the attempted murder of the baby (§§ 664, 187—count II), shooting at an occupied vehicle (§ 246—count III), child endangerment (§ 273a, subd. (a)—count IV), and assault with a firearm (§ 245, subd. (a)(2)—count V). The jury convicted defendant on all counts, finding, with respect to counts I and II, that he had personally and intentionally discharged a firearm (§ 12022.53, subd. (c)), and with respect to counts III, IV, and V, that he had personally used a firearm (§ 12022.5, subd. (a)(1)).

Defendant was sentenced to state prison for 27 years for the attempted murder of Karen—consisting of the middle term of seven years for the attempted murder and a 20-year firearm-use enhancement—to be served concurrently with an identical 27-year term for the attempted murder of the baby. The court stayed sentencing on the remaining counts pursuant to section 654.

The Court of Appeal rejected defendant's claim that the evidence was insufficient to support his conviction of the attempted murder of the baby. We granted defendant's petition for review.

DISCUSSION

Defendant does not challenge his conviction of the attempted murder of Karen A. But he argues his conviction of the attempted murder of the baby must be reversed because, as stated in his opening brief, "only a single attempted murder conviction was possible on the facts here." Specifically, defendant asserts that the fact that he fired only one bullet into the vehicle reflects his intent to kill only one victim—Karen A. He urges that "there was no proof of animus toward the baby," and argues his conviction of the attempted murder of that victim must be reversed for lack of substantial evidence that he harbored specific intent to kill the child.

In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of

---

[1] All further statutory references are to the Penal Code.

fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' " (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 99 S.Ct. 2781].)

" 'Although we must ensure the evidence is reasonable, credible, and of solid value, nonetheless it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts on which that determination depends. [Citation.] Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder. [Citations.]' (*People v. Jones* (1990) 51 Cal.3d 294, 314 [270 Cal.Rptr. 611, 792 P.2d 643].)" (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206.)

We first consider the mental state required for conviction of attempted murder. "The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. (*People v. Lasko* (2000) 23 Cal.4th 101, 107 [96 Cal.Rptr.2d 441, 999 P.2d 666].)" (*People v. Bland* (2002) 28 Cal.4th 313, 327 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*).) In contrast, "[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176]; see *People v. Swain* (1996) 12 Cal.4th 593, 604–605 [49 Cal.Rptr.2d 390, 909 P.2d 994].) Hence, in order for defendant to be convicted of the attempted murder of the baby, the prosecution had to prove he acted with specific intent to kill that victim. (*Bland, supra,* 28 Cal.4th at p. 331.)

Intent to unlawfully kill and express malice are, in essence, "one and the same." (*People v. Saille* (1991) 54 Cal.3d 1103, 1114 [2 Cal.Rptr.2d 364, 820 P.2d 588].) To be guilty of attempted murder of the baby, defendant had to harbor express malice toward that victim. (*People v. Swain, supra,* 12 Cal.4th at pp. 604–605.) Express malice requires a showing that the assailant " ' "either desire[s] the result [i.e., death] or know[s], to a substantial certainty, that the result will occur." [Citation.]' " (*People v. Davenport* (1985) 41 Cal.3d 247, 262 [221 Cal.Rptr. 794, 710 P.2d 861], quoting *People v. Velasquez* (1980) 26 Cal.3d 425, 434 [162 Cal.Rptr. 306, 606 P.2d 341].)

The mental state required for *attempted* murder is further distinguished from the mental state required for murder in that the doctrine of

"transferred intent" applies to murder but not attempted murder. (*Bland, supra,* 28 Cal.4th at pp. 328–329.) "In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder." (*Id.* at p. 317.) In contrast, the doctrine of transferred intent does not apply to attempted murder: "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*Bland, supra,* 28 Cal.4th at p. 328.) Whether the defendant acted with specific intent to kill "must be judged separately as to each alleged victim." (*Id.* at p. 331.)

■ Last, the crime of attempted murder is not divided into degrees. (*People v. Bright* (1996) 12 Cal.4th 652, 665–669 [49 Cal.Rptr.2d 732, 909 P.2d 1354].) The prosecution may seek a jury finding that an attempted murder was "willful, deliberate, and premeditated" for purposes of sentence enhancement. (§ 664, subd. (a); *Bright,* at p. 669.) No such special finding was sought in this case. Accordingly, the prosecution had only to prove that defendant purposefully shot at the baby with express malice in order to establish the requisite state of mind for conviction of attempted murder.

The jury was properly instructed on the elements of attempted murder, including the requirement that defendant be found to have acted with specific intent to kill the baby in order to be convicted of the attempted murder of that victim.

Two important principles of law will further serve to inform the inquiry whether defendant could properly be convicted of two counts of attempted murder on the evidence introduced below, notwithstanding that he fired only one shot into the vehicle.[2]

■ First, with few exceptions, motive itself is not an element of a criminal offense. (See CALJIC No. 2.51; see also *People v. Daly* (1992) 8 Cal.App.4th 47, 59 [10 Cal.Rptr.2d 21]; 1 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Elements, § 4, pp. 202–204.) The jury below was properly so instructed. The crimes of murder and attempted murder are no exception.

---

[2] There is some evidence in the record suggesting defendant may have fired at least two shots at the vehicle. Two spent .38-caliber shell casings were recovered from defendant's possession; he testified he found them on the ground at the scene of the shooting. He also testified he heard more than one shot fired during the incident (although maintaining he was not the shooter). In his brief on the merits, defendant concedes that had there been evidence he fired more than one shot, such evidence might have tended to support a conclusion that he intended more than one death to occur. The prosecutor, however, argued to the jury that this was a "single bullet" case, and the evidence clearly established that only one bullet entered the vehicle. Given the state of the evidence and the theory on which the case was tried, we infer the jury concluded defendant fired a single shot at the vehicle.

True, evidence of motive is often probative of intent to kill. Here, defendant was formerly acquainted with the mother, exchanged words with her, and called her a "bitch" moments before the shooting. These circumstances suggested a motive for defendant's wanting to shoot at the mother, which in turn was probative of whether he shot at her with intent to kill. But evidence of motive is not required to establish intent to kill, and evidence of motive alone may not always fully explain the shooter's determination to shoot at a fellow human being with lethal force.

The second principle often furnishes the evidentiary ground for an inference that a shooter acted with intent to kill. Evidence of motive aside, it is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. (See *People v. Lee* (1987) 43 Cal.3d 666, 679 [238 Cal.Rptr. 406, 738 P.2d 752].) "There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions. (*People v. Lashley* [(1991)] 1 Cal.App.4th [938,] 946 [2 Cal.Rptr.2d 629].) The act of firing toward a victim at a close, but not point blank, range 'in a manner that could have inflicted a mortal wound had the bullet been on target is sufficient to support an inference of intent to kill . . . .' (*Id.* at p. 945.)" (*People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [60 Cal.Rptr.2d 761] (*Chinchilla*); see also *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224–1225 [113 Cal.Rptr.2d 1].) " 'The fact that the shooter may have fired only once and then abandoned his efforts out of necessity or fear does not compel the conclusion that he lacked the animus to kill in the first instance. Nor does the fact that the victim may have escaped death because of the shooter's poor marksmanship necessarily establish a less culpable state of mind.' ([*People v. Lashley, supra,* 1 Cal.App.4th] at p. 945.)" (*Chinchilla*, at p. 690.)

An observation made by this court in *People v. Arias* (1996) 13 Cal.4th 92 [51 Cal.Rptr.2d 770, 913 P.2d 980], also has particular relevance to the inquiry at hand. We explained in that case that "if the jury found defendant's use of a lethal weapon with lethal force was purposeful, an intent to kill could be inferred, *even if the act was done without advance consideration and only to eliminate a momentary obstacle or annoyance.*" (*Id.* at p. 162, italics added.) Although *Arias* involved review of a capital murder conviction, our observation in that case is relevant to our inquiry into defendant's mental state here. The point is that where the act of purposefully firing a lethal weapon at another at close range gives rise to an inference of intent to kill, that inference is not dependent on a further showing of any particular *motive* to kill the victim. This follows from the principle that motive is generally not an element of a crime in the first instance, including the crimes of murder and attempted murder. One may kill with or without a motive and still be found

to have acted with express malice. An inference of intent to kill drawn on evidence of a purposeful shooting with lethal force under all the attendant circumstances can support a conviction of attempted murder even without evidence of motive.

■ These principles, taken together, reflect that the act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon " 'in a manner that could have inflicted a mortal wound had the bullet been on target' " is sufficient to support an inference of intent to kill. (*Chinchilla, supra,* 52 Cal.App.4th at p. 690.) Where attempted murder is the charged crime because the victim has survived the shooting, this principle takes on added significance. Finally, even if the shooting was not premeditated, with the shooter merely perceiving the victim as "a momentary obstacle or annoyance," the shooter's purposeful "use of a lethal weapon with lethal force" against the victim, if otherwise legally unexcused, will itself give rise to an inference of intent to kill. (*People v. Arias, supra,* 13 Cal.4th at p. 162.)

■ Applying these principles to the facts at hand, and viewing the evidence in the light most favorable to the People, presuming the existence of every fact the jury could reasonably deduce from the evidence in support of the judgment, we conclude the evidence is sufficient to support defendant's conviction of the attempted murder of the baby.

The relevant facts are these: Karen A. and her boyfriend Renell arrived on the scene with their three-month-old son, Renell T., Jr. Karen was driving; the baby was in a car seat directly behind her. Karen testified she and defendant were former friends; defendant claimed she was his ex-girlfriend. Defendant appeared and approached the vehicle, looked in through the open passenger's window, and said to Karen, "Don't I know you, bitch?" Defendant testified he saw the baby seated in the backseat directly behind Karen. Renell, who had exited from the vehicle but heard defendant's comment, approached defendant, who lifted his shirt to reveal a handgun tucked in his waistband. An altercation commenced between Renell, defendant, and several other males standing at the scene. Renell managed to reenter the vehicle and Karen started to pull away from the curb. She testified defendant was the only one who had a gun and that he fired a single shot into the vehicle from a position directly behind it and a distance of approximately one car length as she was pulling away from the curb. The slug recovered from the driver's side door

evidenced that defendant shot into the vehicle with a powerful .38-caliber handgun.

The bullet's trajectory is clearly marked in numerous photographic exhibits admitted into evidence at trial and transmitted to this court as part of the appellate record. We know from the trajectory of the bullet that it was fired from a position directly behind the car, consistent with Karen's testimony. The large-caliber bullet missed both the baby and the mother by a matter of inches as it shattered the rear windshield, passed through the mother's headrest, and lodged in the driver's side door. Although the mother was physically unharmed, the screaming baby's face was "full of glass pieces" from the shattered rear windshield.

The defense below offered nothing to undercut the force of the inference, drawn by the jury on the People's evidence, that defendant acted with intent to kill *both* victims when he fired off a single round at them from close range, each of whom he knew was directly in his line of fire. Defendant testified he was not the shooter, the implication being that some unidentified shooter must have fired the shot or shots at the car (defendant testified he heard multiple gun shots). The jury disbelieved him. His defense at trial thus furnishes no support for his claim on appeal that the People's evidence was insufficient to establish his intent to kill the baby.

To summarize, in order for the jury to convict defendant of the attempted murder of the baby, it had to find, beyond a reasonable doubt, that he acted with intent to kill that victim, i.e., that he purposefully shot into the vehicle with "a deliberate intent to unlawfully take away [the baby's] life" (*People v. Lasko, supra,* 23 Cal.4th at p. 104) or knowledge that his act of shooting into the vehicle would, " ' "to a substantial certainty," ' " result in the baby's death. (*People v. Davenport, supra,* 41 Cal.3d at p. 262.) There was no further requirement that a separate, or indeed any motive, be shown for his act of shooting at the baby in order to find that he acted with express malice. (CALJIC No. 2.51.) No minimal period of time for reflection had to be shown in order to establish defendant's criminal state of mind, nor was the prosecution seeking a special jury finding that this attempted murder was "willful, deliberate, and premeditated." (§ 664, subd. (a).) Under the case law surveyed above, evidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both. (*People v. Lee, supra,* 43 Cal.3d at p. 679; *People v. Villegas, supra,* 92 Cal.App.4th at pp. 1224–1225; *Chinchilla, supra,* 52 Cal.App.4th at p. 690; *People v. Lashley, supra,* 1 Cal.App.4th at p. 946.) And even if defendant's act of shooting at the baby was done "without advance consideration and only to eliminate a momentary obstacle

or annoyance," the jury could still infer, from the totality of the circumstances, that he acted with express malice toward that victim. (*People v. Arias, supra,* 13 Cal.4th at p. 162.)

On these facts, we conclude a rational jury could find beyond a reasonable doubt that defendant intended to kill the baby as well as the mother. Defendant suggests in his brief on the merits that "there was no proof of [his] animus toward the baby." But his very act of discharging a firearm into the car from close range and narrowly missing both mother and baby could itself support such an inference. Indeed, given defendant's claim at trial that Karen was his ex-girlfriend, and given the circumstance that she had just arrived on the scene with a new boyfriend and their baby, the jury could well have inferred that defendant felt "animus" toward both the mother and her baby when he started shooting. In any event, even if defendant subjectively believed he had a particular reason or cause to shoot at the mother, that does not preclude a finding that he also harbored express malice toward the baby when he fired into the vehicle with both victims directly in his line of fire. Defendant's assertion on appeal—that his motive to kill Karen but not the baby establishes his intent to kill her but precludes a finding that he also harbored express malice toward the baby—is without support in the facts or the law.

Defendant further argues that "[he] fired from a point very near the car, and thus a 'high potential for accuracy' existed." He asks this court to infer from that circumstance that "the fact that the baby was *not* hit, under such conditions of accuracy, tends to prove the baby was *not* a target." In light of the deferential standard of review that applies to this sufficiency of evidence claim, we must reject his interpretation of the evidence.

Did the fact that defendant fired a single bullet at the victims as a matter of law preclude his conviction for the attempted murders of both Karen and the baby? The decision in *Chinchilla, supra,* 52 Cal.App.4th 683, on which the Court of Appeal below relied, is directly on point. The *Chinchilla* court affirmed two convictions of attempted murder based on the firing of a single bullet at two police officers who were crouched, *one behind the other*, in the shooter's line of fire. The court held that "intent to kill two different victims can be inferred from evidence that the defendant fired a single shot at the two victims, both of whom were visible to the defendant." (*Chinchilla, supra,* 52 Cal.App.4th at p. 685.)

The *Chinchilla* court placed principal reliance on *People v. Lashley, supra,* 1 Cal.App.4th 938, quoted above, for the propositions that intent to kill usually must be inferred from a defendant's actions and all the circumstances surrounding the attempted killing; that the act of firing at a victim from close

range in a manner that could have inflicted a mortal wound had the bullet been on target is itself sufficient to support an inference of intent to kill; that the fact that a shooter fires only once and then, out of necessity, abandons his efforts, does not compel the conclusion that he lacked the animus to kill in the first instance; and that the fact that the victim or victims may have escaped death due to the shooter's poor marksmanship does not necessarily establish a less culpable state of mind. (*Chinchilla, supra,* 52 Cal.App.4th at p. 690; *People v. Lashley, supra,* 1 Cal.App.4th at pp. 945–946.) The court explained: "Where a defendant fires at two officers, one of whom is crouched in front of the other, the defendant endangers the lives of both officers and a reasonable jury could infer from this that the defendant intended to kill both." (*Chinchilla, supra,* 52 Cal.App.4th at p. 691.)

In reviewing sufficiency of evidence claims, each case of necessity must turn on its own particular facts. (*People v. Thomas* (1992) 2 Cal.4th 489, 516 [7 Cal.Rptr.2d 199, 828 P.2d 101]; *People v. Chambers* (1982) 136 Cal.App.3d 444, 455 [186 Cal.Rptr. 306].) As we read *Chinchilla, supra,* 52 Cal.App.4th 683, the court in that case expressly acknowledged the controlling principles set forth in *People v. Lashley, supra,* 1 Cal.App.4th 938, and in affirming both attempted murder convictions, refused to invade the province of the jury that had reasonably invoked those principles in finding that the defendant intended to kill both officers when he saw them both, crouched one behind the other directly in his line of fire, and fired at them. (*Chinchilla, supra,* 52 Cal.App.4th at p. 691.) The fact that the defendant in *Chinchilla,* for whatever reason, fired only a single shot was not dispositive.

In urging the Court of Appeal to reverse his conviction of the attempted murder of the baby on grounds of insufficient evidence, defendant asserted that this court's opinion in *Bland, supra,* 28 Cal.4th 313, "provide[s] the essential key for analysis of the sufficiency of the evidence issue here." He argued to the court that *Bland* "makes it perfectly clear that only one count of attempted murder can stand on these facts" because, according to defendant, here there was "no evidence whatsoever that [defendant] had any motive or intent to kill the baby, himself," and *Bland*'s "kill zone" exception does not apply because "[t]his is not a bomb-on-the-airplane case or a rocket-propelled-grenade case or a hail-of-bullets case; this is a single-shot case."

Defendant misreads this court's decision in *Bland. Bland*'s "kill zone" theory does not preclude a conclusion that defendant's act of firing a single bullet at Karen and her baby, both of whom were in his direct line of fire, can support two convictions of attempted murder under the totality of the circumstances shown by the evidence. *Bland* simply recognizes that a shooter

may be convicted of multiple counts of attempted murder on a "kill zone" theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the "kill zone") as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm. (*Bland, supra,* 28 Cal.4th at pp. 329–330.) As we explained in *Bland,* "This concurrent intent [i.e., 'kill zone'] theory is not a legal doctrine requiring special jury instructions . . . . Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (*Bland, supra,* 28 Cal.4th at p. 331, fn. 6.)

Defendant's argument—that *Bland*'s kill zone rationale controls this case and requires reversal of his conviction of the attempted murder of the baby—is incorrect. It is founded on the incorrect assumption that all single-bullet cases involving more than one attempted murder victim must be analyzed under a kill zone rationale. And it is further founded on the incorrect assumption that a shooter who fires a single bullet at two victims who are both, one behind the other, directly in his line of fire, cannot, as a matter of law, be found to have acted with express malice toward both victims.

We have explained why defendant's assertion—that he had a motive to kill Karen A. but not her baby, and that consequently, because he fired only a single shot, he cannot be found to have acted with express malice toward both victims—is both factually and legally incorrect. We have further explained why his conclusion that *Bland, supra,* 28 Cal.4th 313, must be deemed to control this single-shot case is in error.[3] The jury below was not given special "kill zone" instructions, nor does *Bland* require the giving of any such special instructions. Rather, the jury was properly instructed on all the elements of attempted murder, including the requirement of express malice, and found, on these facts, that defendant intended to kill both victims, each of whom, the evidence showed, was directly in his line of fire when he shot at them with lethal force.

Our dissenting colleagues suggest the evidence was insufficient to support an inference that defendant intended to kill the baby "with whom, as far as the evidence showed, defendant had no quarrel at all." (Dis. opn., *post,* at p. 749.) We disagree. The ballistics evidence established that the large-caliber bullet defendant fired into the vehicle from a distance of one car length away missed the mother *and* baby by a matter of inches. Defendant's own

---

[3] We thus have no occasion here to decide under what factual circumstances, if any, the firing of a single bullet might give rise to multiple convictions of attempted murder under *Bland*'s kill zone rationale.

testimony established he knew the baby was in the backseat positioned directly behind the mother, and hence directly in his line of fire when he fired the shot into the vehicle. When the facts are considered under the standard of review applicable to this sufficiency of evidence claim, which requires us to view the evidence in the light most favorable to the People and to presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence (*People v. Ochoa, supra,* 6 Cal.4th at p. 1206), we find the evidence sufficient to support the jury's finding that defendant acted with intent to kill the baby.

The dissent further suggests we have "struggle[d] to articulate grounds for upholding the second attempted murder conviction," and that "[i]n the course of that struggle, the majority loses sight of the crucial difference between implied malice, or conscious disregard for life, and express malice, which is the specific intent to kill a person." (Dis. opn., *post*, at p. 749.) The dissent misconstrues our rationale. In deciding this fact-specific sufficiency of evidence claim, it is not our intention to blur the distinction between express and implied malice in the law of murder and attempted murder, nor should our opinion today be so read. We do not base our conclusion that defendant's conviction of the attempted murder of the baby must be affirmed on mere grounds that he "placed the infant's life in danger by shooting in his direction." (Dis. opn., *post*, at p. 749.) Rather, we base our conclusion on evidence in the record that, a rational jury could find, establishes beyond a reasonable doubt that defendant acted with intent to kill *both* the baby and the mother when he shot at them with a large-caliber bullet from close range knowing each was directly in his line of fire.

Finally, the dissent suggests the fact "[t]hat defendant had displayed overt hostility toward Karen and none at all toward the baby is, in the majority's view, immaterial because conviction of attempted murder does not require proof of a motive for killing." (Dis. opn., *post*, at p. 749.) This too misconstrues our analysis of defendant's claim.

Defendant is not challenging the sufficiency of the evidence to support his conviction of the attempted murder of Karen A. But the dissent points to defendant's "overt hostility" toward Karen A., which constituted some evidence that he had a motive to want to kill her, and in essence concludes such motive evidence was the only evidence of intent to kill in this case. From that the dissent reasons that because defendant supposedly "had no quarrel" with the baby and intentionally fired only a single bullet into the vehicle, that bullet could only have been intended to kill Karen A. and not the baby.

The dissent's rationale requires that the evidence in this case be viewed in a light most favorable to the defense rather than the prosecution, which

prevailed below. It would require this court to draw an inference that defendant "had no quarrel" with the baby and intentionally fired off a single shot to kill the mother, notwithstanding testimony suggesting Karen A. may have been defendant's former girlfriend and evidence that defendant had become embroiled in an altercation with her current boyfriend, the baby's father, moments before the shooting; that defendant saw the baby in the backseat and therefore knew the infant was in his line of fire when he fired the shot into the vehicle; and that the bullet missed both the mother *and the baby* by a matter of inches—all of which supports an inference that defendant shot into the vehicle with intent to kill the baby as well as the mother.

Defendant's display of hostility toward Karen A. surely constituted some evidence that he had a motive to shoot at her, which in turn was probative of whether he intended to kill her. But the fact that defendant displayed "overt hostility" toward Karen A. moments before the shooting was not the *only* evidence that he shot at her with intent to kill. Defendant's very act of discharging a lethal firearm at her from close range " 'in a manner that could have inflicted a mortal wound' " (*Chinchilla, supra,* 52 Cal.App.4th at p. 690) is itself evidence sufficient to support an inference of intent to kill.

The question whether the evidence was sufficient to support defendant's conviction of the attempted murder of the baby must be analyzed in the same way. The physical evidence showed both Karen A. and her baby were directly in defendant's line of fire; the testimonial evidence established defendant had looked into the open passenger window of the vehicle moments before the shooting and knew the baby was positioned in the backseat directly behind her. The bullet missed both the mother *and* the baby by inches. Although there was evidence that defendant exhibited overt animosity toward Karen A., which is probative of whether he acted with intent to kill her, the facts also support an inference that defendant intended to kill the baby as well. The infant was the offspring of Karen A. and her current boyfriend, the baby's father, all three of whom had just arrived on the scene only moments before defendant's hostile verbal exchange with the mother, his physical altercation with the father, and his determination to shoot at the mother and child as the vehicle pulled away from the curb. The jury could have concluded that because defendant viewed Karen A. as his former girlfriend, he harbored animosity toward the child she had with her current boyfriend.

Viewing the record in the light most favorable to the conviction obtained by the prosecution below, we conclude the evidence is sufficient to support defendant's conviction of the attempted murder of the baby. The fact that only a single bullet was fired into the vehicle, or that defendant exhibited overt animosity toward the mother but not the baby moments before the shooting, does not, as a matter of law, compel a different result.

CONCLUSION

The judgment of the Court of Appeal is affirmed, and the matter remanded to that court for further proceedings consistent with the views expressed herein.

George, C. J., Kennard, J., Chin, J., and Boren, J.,[*] concurred.

**WERDEGAR, J., Dissenting.**—I respectfully dissent. In my view, defendant's conviction for the attempted murder of Renell T., Jr., is unsupported by substantial evidence.

Defendant fired a single bullet into a moving car, narrowly missing the driver and her infant son, after quarreling with the driver and the driver's boyfriend. There was ample evidence to support the jury's finding defendant was trying to kill the driver. The evidence was ample also that he acted recklessly, or even with conscious disregard for life, as to the baby. The evidence was insufficient, however, to permit the jury to infer beyond a reasonable doubt that defendant *intended to kill the baby*, with whom, as far as the evidence showed, defendant had no quarrel at all. The majority struggles to articulate grounds for upholding the second attempted murder conviction. In the course of that struggle, the majority loses sight of the crucial difference between implied malice, or conscious disregard for life, and express malice, which is the specific intent to kill a person.

The majority reasons that because both Karen and her son were in the line of defendant's fire, and therefore defendant's single shot could have killed either, the jury could infer he intended to kill both. That defendant had displayed overt hostility toward Karen and none at all toward the baby is, in the majority's view, immaterial because conviction of attempted murder does not require proof of a motive for killing. (Maj. opn., *ante*, at pp. 743–744.) The majority is of course correct that intent may ordinarily be inferred from action. But to support the inference that defendant intended to kill the infant, the majority points to no aspect of defendant's action other than that he placed the infant's life in danger by shooting in his direction. The majority thus permits knowing endangerment, which establishes at most *implied* malice, to serve, by itself, as proof beyond a reasonable doubt of intent to kill. This result is contrary to fundamental concepts of California homicide law recognized in the majority opinion (*id.*, at pp. 739–740) and discussed

---

[*]Presiding Justice of the Court of Appeal, Second Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

further below (*post*, at pp. 750–752), in particular the distinction between implied and express malice and the requirement that the latter be proven as an element of attempted murder.

FACTS

Karen A. drove her boyfriend, Renell T., Sr. (Renell), to a friend's house. Their three-month-old baby, Renell T., Jr., sat in a rear-facing infant car seat in the backseat directly behind Karen, and Renell sat in the front passenger seat. Karen parked along the curb on the street in front of the house, and Renell got out of the car. As Karen waited in the car to make sure Renell's friend was home, she saw defendant, a former friend, approaching from behind. The last time Karen had spoken to defendant was in a telephone conversation approximately eight to nine months before, during which defendant had told her the next time he saw her he would "slap the shit out of [her]."

Defendant walked to the front passenger window of Karen's car, looked inside and said, "Don't I know you, bitch?" Turning around from the walkway leading to the house, Renell said, "Well, you don't know me." Renell walked back to the car, and as he and defendant confronted each other, defendant lifted his shirt and displayed a handgun in his waistband. Renell said, "It is cool," and backed away from defendant. A group of men from the street corner began approaching the car, and as Renell entered the vehicle through the front passenger door, defendant and the other men began striking him.

As soon as Renell was securely inside the car, Karen pulled away from the curb. After driving about one car length, Karen looked into her rearview mirror and saw defendant standing directly behind the car holding a gun. She heard a single gunshot; although she did not see defendant pull the trigger, he was the only person she had seen with a gun. As soon as she reached a place of safety, she stopped to check the baby for injuries. The rear window had shattered; the baby was screaming, and his face was "full of glass pieces." Later, the police determined the bullet had entered through the rear window, passed through the driver's headrest and lodged in the driver's door.

DISCUSSION

The only question before the court is the sufficiency of evidence to prove defendant attempted to kill Renell T., Jr., Karen and Renell's three-month-old infant. (Defendant does not challenge his convictions for attempted murder of

Karen (Pen. Code, §§ 187, 664),[1] for child endangerment (§ 273a, subd. (a)) and assault with a firearm (§ 245, subd. (a)(2)) on the baby, or for shooting at an occupied vehicle (§ 246).) The Court of Appeal held the evidence sufficient on a "kill zone," or "concurrent intent," theory. (See *People v. Bland* (2002) 28 Cal.4th 313, 331 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*).) We granted defendant's petition for review to consider that question.

"Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623 [3 Cal.Rptr.3d 402, 74 P.3d 176].) "The mental state required for attempted murder has long differed from that required for murder itself." (*Bland, supra*, 28 Cal.4th at p. 327.) For murder, malice may be express or implied. "Malice is *express* when the killer harbors a deliberate intent to unlawfully take away a human life. Malice is *implied* when the killer lacks an intent to kill but acts with conscious disregard for life, knowing such conduct endangers the life of another." (*People v. Lasko* (2000) 23 Cal.4th 101, 104 [96 Cal.Rptr.2d 441, 999 P.2d 666]; see § 188.) To be guilty of attempted murder, the defendant must harbor express malice; implied malice will not suffice. (*People v. Swain* (1996) 12 Cal.4th 593, 604–605 [49 Cal.Rptr.2d 390, 909 P.2d 994].) Express malice, or intent to kill, requires more than knowingly placing the victim's life in danger: it requires at the least that the assailant either " ' "desire the result," ' " i.e., death, or " ' "know, to a substantial certainty, that the result will occur." ' " (*People v. Davenport* (1985) 41 Cal.3d 247, 262 [221 Cal.Rptr. 794, 710 P.2d 861].)

We also "distinguish between a completed murder and attempted murder regarding transferred intent." (*Bland, supra*, 28 Cal.4th at p. 328.) "In its classic form, the doctrine of transferred intent applies when the defendant intends to kill one person but mistakenly kills another. The intent to kill the intended target is deemed to transfer to the unintended victim so that the defendant is guilty of murder." (*Id.* at p. 317.) Transferred intent, however, does not apply to attempted murder: "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else." (*Id.* at p. 328.) Thus the defendant's mental state "must be judged separately as to each alleged victim." (*Id.* at p. 331.) Thus defendant's specific intent to kill Karen, which was adequately proven by the evidence, does not "transfer" to provide the specific intent to kill her baby; the prosecution was required to prove defendant's mental state as to the baby individually.

In determining whether the prosecution met its burden, the test is whether a rational jury could have found beyond a reasonable doubt that defendant harbored the requisite specific intent to kill the baby. (*People v. Ochoa* (1993)

---

[1] All further statutory references are to the Penal Code.

6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].) In his briefing, the Attorney General posited two factual theories to support the conviction: (1) that defendant actually targeted and thus intended to kill the baby, and (2) that defendant had the concurrent intent to kill the baby's mother, his primary target, and the baby, a nontargeted person.

### Actual Targeting

The Attorney General contends the evidence is sufficient to support the conviction for the attempted murder of the baby on a theory of actual targeting because defendant knew the baby was seated directly behind Karen when he fired a bullet into the vehicle. The majority agrees.

The specific intent to kill needed for attempted murder may, in many cases, be inferred from the defendant's acts and the circumstances surrounding the alleged attack. (See *People v. Lee* (1987) 43 Cal.3d 666, 679 [238 Cal.Rptr. 406, 738 P.2d 752].) Here, the evidence shows *only* that defendant knew the baby was seated directly behind Karen when he fired one bullet into the car; neither circumstantial nor direct evidence shows that defendant—in contrast to his animosity toward Karen—bore any desire to harm the baby. Certainly in shooting a single bullet in the direction of two people without justification or provocation, defendant acted with, at least, implied malice toward both of them; a jury could also reasonably conclude that he acted with intent to kill *one* of the two. But this evidence is insufficient to permit a reasonable jury to conclude beyond a reasonable doubt that defendant acted with intent to kill the baby as well as Karen because, under the circumstances of this case, defendant's single shot provides an inadequate basis for an inference that he *actually targeted* the baby.

To be sure, motive is not a legal element of the crime of attempted murder; in many cases, the evidence of a defendant's actions will be sufficient to show express malice without proof the defendant had a motive for killing the victim. In many circumstances, perhaps most, the act of shooting a loaded firearm in a person's direction from short range would, in itself, support an inference of intent to kill, even were the assailant's reasons for shooting unknown. In this, I agree with the majority. (Maj. opn., *ante*, at p. 741.) But the majority draws too broad an inference from defendant's act. When, as here, the defendant has shot only once in the direction of *two* people, only one of whom he had any reason to attack, the act of shooting gives rise, at most, to an inference the defendant intended to kill the person he had a motive for killing.

The majority's argument reduces to this claim: from defendant's knowledge of the baby's location and his shooting in the direction of both Karen

and the baby, the jury could reasonably infer defendant intended to kill them both. In so reasoning, the majority stretches the meaning of intent to kill so far as to make it indistinguishable from the conscious disregard for life that constitutes implied malice. If conscious disregard of a risk of death—shown here by defendant's act of firing in the baby's direction—suffices to support an inference of intent to kill, no difference is discernable between the two types of malice.

As we held in *Bland, supra*, 28 Cal.4th at pages 328–329, intent to kill does not "transfer" from victim to victim for purposes of attempted murder; to prove defendant attempted to kill the baby, the prosecution had to prove he intended to kill *the baby*. Intent to kill Karen is insufficient for this charge. Defendant's evident lack of motive for killing the baby, in contrast to his marked animosity toward Karen, is critical not because motive is an element of the crime, but because his lack of motive as to the baby points to the only rational answer to the question, whom did defendant in firing his single shot actually target and intend to kill?

The majority reasons that defendant's act of firing in the child's direction, thereby placing the child's life at serious risk, shows defendant harbored animus toward the child, from which the jury could find he desired the child's death. (Maj. opn., *ante*, at pp. 743, 748.) But if, as the majority argues, the act of placing a person's life at risk, in itself, shows the intent to kill that person, nothing differentiates the two types of malice, a conclusion contrary to the fundamental California law of homicide embodied in section 188. The suggestion that endangerment also shows animus adds nothing to the analysis, for the inference of intent to kill is still being drawn from the act of endangerment.

In short, the majority would sanction an inference of intent to kill solely from an act knowingly endangering the victim. But, as noted earlier, intent to kill requires that the assailant either " ' "desire" ' " the victim's death or " ' "know, to a substantial certainty, that the result will occur." ' " (*People v. Davenport, supra*, 41 Cal.3d at p. 262.) Here there was no evidence, other than his act endangering the baby, that defendant *desired* the baby dead. Nor was defendant's means of attack so powerful that it made *substantially certain* the death of both Karen and her infant son. If, as the majority would have it, proof of knowing endangerment suffices to support a finding of intent to kill—without any evidence the assailant either wanted to kill the victim or acted so as to make the victim's death substantially certain—then the distinction between implied and express malice has been effectively obliterated.

The majority's reasoning potentially opens the door to an unlimited number of attempted murder convictions based on a single act intended to kill

a single person—without proof the defendant used means intended to create a kill zone around the target. How, one must ask, is the number of attempted murder convictions arising from a single shot limited under the majority's reasoning? If assailant D shoots a handgun once at close range in the direction of a targeted victim, V1, who is standing in a close crowd of strangers, V2 through V10, could a jury find D intended to kill all 10 victims, even in the absence of evidence D had any reason to want V2 through V10 dead? To the suggestion D bore no animus against anyone but V1, the majority would presumably respond that "his very act of discharging a firearm into the [crowd] from close range and narrowly missing [V2 through V10] could itself support such an inference." (Maj. opn., *ante*, at p. 744.) The majority's reasoning cannot be correct, for it results in the absurd conclusion that an assailant has tried to murder everyone his act endangers.

*People v. Chinchilla* (1997) 52 Cal.App.4th 683 [60 Cal.Rptr.2d 761], upon which the majority relies, is distinguishable. The appellate court there affirmed two convictions for attempted murder arising out of the defendant's having fired one bullet at two pursuing police officers, one of whom was crouched in front of the other. (*Id.* at pp. 687, 690–691.) Mr. Chinchilla had equal reason to try to kill each of the pursuing officers. In the present case, in contrast, defendant had threatened Karen with violence but, as far as the evidence showed, had no reason to attack her infant child. Even if a jury could reasonably find, from his act of shooting once, that Mr. Chinchilla intended to kill both officers, the evidence of defendant's single shot in this case did not justify a parallel inference.[2]

Despite claiming evidence of motive is unnecessary in these circumstances, the majority repeatedly suggests defendant might have wanted to kill Karen and Renell's baby because, according to him, Karen was his former girlfriend (rather than just a friend as she testified). (Maj. opn., *ante*, at pp. 742, 744, 747, 748.) The jury, however, obviously did not believe defendant's version of events; if they had, they would not have convicted him at all. Even defendant's testimony, moreover, fails to support the inference the majority puts forward; defendant testified his argument with Karen the day before the confrontation with Renell arose because Karen was reluctant to give him a ride in her car, as she sometimes did. His testimony indicates he was angry at *Karen* for her reluctance and for the language she used toward him in the ensuing argument. Nothing suggests he was angry with or about the baby she had recently had with Renell.

---

[2] For the proposition that the intent to kill both victims could be inferred from defendant's single shot in their direction, the majority also cites *People v. Lee, supra,* 43 Cal.3d at page 679, *People v. Villegas* (2001) 92 Cal.App.4th 1217, 1224–1225 [113 Cal.Rptr.2d 1], and *People v. Lashley* (1991) 1 Cal.App.4th 938, 946 [2 Cal.Rptr.2d 629]. None of those decisions, however, addresses whether or under what circumstances a person may be held liable for *two* or more counts of attempted murder for the act of firing a single shot.

The inference the majority would draw as to why defendant might wish to harm the infant is thus entirely speculative. It *could* be true (if one disbelieves Karen and believes defendant as to their prior relationship), but no evidence to that effect appears in the record. Speculation does not constitute substantial evidence. (*People v. Lewis* (2001) 26 Cal.4th 334, 369 [110 Cal.Rptr.2d 272, 28 P.3d 34].)

Finally, even indulging this speculation and assuming defendant wanted to kill Renell T., Jr., because he was another man's son, in order to find defendant intended to kill both Karen and the baby one would also have to infer he intended somehow to hit and kill both with his single shot. Though the majority does not fully articulate its factual theory, its repeated invocation of the "large-caliber" bullet used here (maj. opn., *ante*, at pp. 743, 746, 747) is presumably intended to suggest defendant intended to shoot Karen *through* her baby. Of course, a single bullet *can* hit and even kill two people, but here (where the baby presented a notably small target and the bullet would, in addition, have had to traverse the infant car seat and the driver's seat without deflection) there was no evidence defendant was capable, or believed himself capable, of such a feat of marksmanship. Again, an appellate court's speculation cannot substitute for evidence at trial.

### Concurrent Intent to Kill

Although the majority purports not to rely on this point (maj. opn., *ante*, at p. 746), the Attorney General alternatively contends the evidence is sufficient to support defendant's conviction for the attempted murder of the baby on a concurrent intent theory because defendant intentionally created a "kill zone," from which the jury could reasonably infer he concurrently intended to kill both Karen, his intended target, and her baby.

We have explained that multiple attempted murder convictions may be sustained on a "kill zone," or "concurrent intent," theory when the evidence shows the defendant used lethal force of a type and extent calculated to kill everyone in an area, including but not limited to the victim shown to be the defendant's primary target, as a means of accomplishing the killing of the primary target. Under these circumstances, the fact finder could rationally infer the defendant intended to kill not only his or her primary target, but also concurrently intended to kill all those in the zone of fatal harm. (*Bland, supra,* 28 Cal.4th at pp. 329–330.) A kill zone, or concurrent intent, analysis, therefore, focuses on (1) whether the fact finder can rationally infer from the type and extent of force employed in the defendant's attack on the primary

target that the defendant intentionally created a zone of fatal harm, and (2) whether the nontargeted alleged attempted murder victim inhabited that zone of harm. (*Harrison v. State* (2004) 382 Md. 477, 495 [855 A.2d 1220, 1231].)

In *Bland*, we illustrated the operation of the kill zone, or concurrent intent, theory of attempted murder with several examples: " '[A]n assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.' " (*Bland, supra*, 28 Cal.4th at pp. 329–330, quoting *Ford v. State* (1992) 330 Md. 682 [625 A.2d 984].) In *Bland* itself, we explained, the evidence strongly supported an inference of concurrent intent to kill: the defendant and a fellow gang member intentionally created a zone of fatal harm when they fired a "flurry of bullets" into a fleeing car, justifying convictions for attempted murder of the passengers. (*Bland, supra*, at p. 331.)

Here, defendant did not fire multiple shots at Karen; he fired one bullet in Karen's direction at a distance of about a car's length from the rear of the moving vehicle. By firing a single shot, defendant did not use a type or degree of force reasonably calculated to kill everyone in the vehicle. Defendant's method of attack was not comparable to the "kill zone" examples and decisions we cited in *Bland*: detonating a bomb on a commercial airplane (*Bland, supra*, 28 Cal.4th at pp. 329–330), using an explosive device or automatic weapon fire against a group of people (*id.* at p. 330), spraying wall-piercing bullets at occupied houses (*ibid.*, citing *People v. Vang* (2001) 87 Cal.App.4th 554, 563–565 [104 Cal.Rptr.2d 704]) or mailing poisoned candy to a household (*Bland, supra*, at p. 331, citing *People v. Gaither* (1959) 173 Cal.App.2d 662, 666–667 [343 P.2d 799]). Nor was defendant's method of attack comparable to the firing of multiple gunshots into a fleeing car by the defendant in *Bland* itself. (*Bland, supra*, at pp. 330–331.) That the bullet came close to hitting Karen *and* her baby does not, without more, establish that by firing a single shot in the direction of Karen, his intended target, defendant intentionally created a zone of fatal harm around Karen such that he may be deemed to have intended to ensure her death by killing the baby as well.

The Attorney General, nevertheless, insists defendant intentionally created a zone of fatal harm by firing one bullet into the car because "[t]he baby and Karen were positioned in the car in such a way that [defendant], firing from the rear, could not have killed Karen without shooting through the baby first." This argument finds no support in the record; the evidence shows neither that the bullet necessarily had to pass through the baby to kill Karen,[3] nor that the ammunition defendant used was of a kind likely to kill two persons in the manner the Attorney General suggests.

Although the majority disavows any reliance on the kill zone theory, the import of the majority opinion is that an act aimed at killing one person creates a kill zone that includes everyone who *could* have been killed by the act, regardless of whether the assailant used means actually calculated to kill everyone in the target's vicinity. If a single shot with a handgun constitutes not only an attempt on the life of a person at whom the jury could find the shot was actually aimed, but also an attempt on the life of anyone else nearby, the careful analysis in *Bland* was unnecessary: the limited concurrent intent theory of *Bland* would be obviated, subsumed in a much broader endangerment theory.

The majority's expansion of attempted murder liability to cover mere endangerment is unnecessary in order to ensure assailants are appropriately punished for acts that place victims' lives in danger. Unjustified shooting in other people's direction, even when not intended to kill them, will ordinarily subject the shooter to liability for assault or a related offense. Here, as noted, defendant was convicted of assault with a firearm, child endangerment and shooting at an occupied vehicle in addition to the attempted murder counts. Sentencing on these felony convictions was stayed under section 654, but if defendant were not sentenced for attempted murder of the infant he could be sentenced on one or more of these charges, which carry substantial punishments. (See § 245, subd. (a)(2) [sentence of two, three or four years in prison]; § 246 [three, five or seven years]; § 273a, subd. (a) [two, four or six years]; § 12022.5, subd. (a) [firearm use enhancement of three, four or 10 years].)

---

[3] Indeed, photographic evidence showed that the top of the rear-facing infant car seat in which the baby sat reached just to the bottom of the driver's headrest, a few inches below the point where the bullet hit that headrest. Unless the head of the three-month-old baby extended some inches above his car seat, therefore, the evidence left it entirely possible for a gunman to shoot Karen in the head without hitting the baby. While the evidence thus tends to show defendant *recklessly* placed the baby at grave risk by firing in his direction, it does not show he intended to shoot the baby as a means of shooting Karen. Implied malice was amply proven; express malice was not.

## CONCLUSION

Because the record contains no substantial evidence from which a jury rationally could infer either that defendant actually targeted Karen's child, as well as Karen, when he shot once at the car, or that he employed a means of attack calculated to kill everyone surrounding Karen, the evidence is insufficient to show defendant had the specific intent to kill the infant, as required to sustain a conviction for attempted murder. Defendant's conviction on that count should therefore be reversed.

Moreno, J., concurred.