Filed 9/29/25  P. v. Castro CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B337183 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA125696) |
| v. | |
| JUSTIN DOMINIC CASTRO, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Victor D. Martinez, Judge.  Affirmed.

Karyn H. Bucur, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Jason Tran and Megan Moine, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Justin Castro of attempted murder. On appeal, Castro contends there was insufficient evidence to support that conviction, and instead, the evidence shows he acted in self-defense. Because there was sufficient evidence to support the judgment, we affirm.

## BACKGROUND

I.    Evidence at Castro's trial

On the morning of September 2, 2020, around 8:00 a.m., Pedro Gonzalez was doing construction work at a hospital in Baldwin Park. While walking to get supplies, he noticed a man wearing a dark or gray hoodie at the bus stop. Gonzalez got his supplies and was walking back through the parking lot when he saw a car pull up and two men who looked like they were going to fight. All of a sudden there was a shooting. The shooter was the same man Gonzalez had seen at the bus stop. To Gonzalez, it sounded like the shooter's gun jammed after shots were fired, and the shooter cursed when it happened. The shooter walked to a black car that a woman was driving, yelled at her to shut up, and pointed a gun at her. The man who was shot, Danny Pinion, ran toward the hospital's entrance. Gonzalez never saw Pinion with a gun. Two days after the shooting, Gonzalez identified Castro from a photographic six-pack as the shooter.

Nora Ortega was working at the hospital's outdoor flu clinic that day. In a statement she gave to police soon after the shooting, Ortega said a man in white shorts, Pinion, got out of a car, and a second man in gray shorts had a gun. Pinion put his hand in his pocket, but Ortega did not know if he was going to pull something out. At some point, the man in gray shorts started shooting. The shooter in gray shorts ran to a hilly grass

area and fell.  When the shooter saw Pinion walking toward him, the shooter started shooting again.[1]

Alan Olgren was parked at the hospital that morning, waiting for his wife.  He heard gunshots and saw a man running on the grass, "kind of like shooting backwards."  The man fell, and a wallet and cellphones fell out of his pocket.  Olgren recovered the items, which included Castro's debit and identification cards.

A 911 caller said that the "suspect firing the gun" walked down Baldwin Park Boulevard, and the victim got into a black car.  A second 911 caller referred to "a gunman" running toward Amar Road.

Surveillance footage from the hospital showed Castro on the sidewalk alongside the hospital.  (Peo. Ex. 12.)  When Pinion arrived at the hospital and exited the car, Castro changed course, walked across a grassy area, and ran toward Pinion, who had just exited the car.  Castro shot in Pinion's direction as Pinion ran away, with Castro in pursuit.

Pinion was treated for a gunshot wound to the abdomen.  He refused to speak to law enforcement.

At about 8:15 a.m., soon after the shooting, Estella Amezcua was at her apartment on Amar Road in Baldwin Park.  Castro entered her apartment, pointed a gun at her, and demanded that she hide him.  Amezcua said she would hide him in the outside laundromat, but she locked the door when Castro exited the apartment.

---

[1]    At trial, however, Ortega said the two men exchanged words and shot at each other.  She also said that the man who shot first wore a gray sweater, rather than gray shorts.

Eduardo Moreno also lived at the apartment complex on Amar Road. At about 8:15 a.m., he was walking to his apartment when Castro ran up to him and asked for a ride. Moreno refused, saying his kids were alone. Castro pointed a gun at Moreno and demanded his wallet and keys. Moreno gave his wallet and car keys to Castro, but Castro did not take Moreno's car, apparently because he could not operate it.

Around this same time, Carlos Castillo was in his car at the apartment complex, getting ready to leave for work. Castro pointed a gun at Castillo and forced Castro to drive him to a specific area.

Then, around 6:00 p.m.,[2] Benjamin Lieu was working at a store in Rosemead. Castro refused to pay for cigarettes, pointed a gun at Lieu, and said he would pay another day.

At about 7:00 p.m., Oscar Perez Conchas was outside his house in Pico Rivera. While Conchas was washing his car, Castro pointed a gun at him and asked for Conchas's car keys. Conchas gave his keys and cellphone to Castro, who left in Conchas's car.

Castro returned to the apartment complex on Amar Road, where he was arrested in the late evening. A gun was found on the apartment complex's roof. After his arrest, Castro told law enforcement that he was a member of the South Side Sangra gang in San Gabriel.

Cartridge casings recovered from the hospital where Pinion was shot were fired from the gun found at the apartment complex.

---

[2] Although the reporter's transcript states that the robbery occurred at 6:00 a.m., it appears that the robbery occurred in the evening.

4

II.    Verdict and sentence

Castro was tried by a jury.  The trial court instructed the jury on attempted murder and on self-defense.

The jury convicted Castro of attempted murder and found true premeditation and gun use allegations (Pen. Code,[3] §§ 187, subd. (a), 664, 12022.53, subds. (b) & (c); count 1); first degree burglary, person present, and found true a personal gun use allegation (§§ 459, 667.5, subd. (c)(21), 12022.5, subd. (a); count 3 [Amezcua]); two counts of second degree robbery and found true personal gun use allegations (§§ 211, 12022.53, subd. (b); counts 4 [Moreno] & 7 [Lieu]); kidnapping for carjacking and found true a personal gun use allegation (§§ 209.5, subd. (a), 12022.53, subd. (b); count 5 [Castillo]); and carjacking and found true a personal gun use allegation (§§ 215, subd. (a), 12022.53, subd. (b); count 6 [Conchas]).[4]

On April 17, 2024, the trial court sentenced Castro.  It struck all five-year prior allegations under section 667, subdivision (a)(1).  The trial court then sentenced Castro to consecutive 25 years to life sentences on each count, plus 20 years on count 1 for the gun enhancement, 3 years for the 12022.5, subdivision (a) enhancement on count 3, and 10 years on each of the gun enhancements on counts 4, 5, 6, and 7.  His total sentence therefore was an indeterminate term of 150 years to life plus a determinate term of 65 years.

---

[3]    All further undesignated statutory references are to the Penal Code.

[4]    The People dismissed count 2 before trial.

## DISCUSSION

Castro challenges the sufficiency of the evidence to support his attempted murder conviction, contending that the evidence instead shows he acted in self-defense. As we now explain, this contention rests on a misunderstanding of the standard of review.

That standard of review requires us to " 'review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *Jackson v. Virginia* (1979) 443 U.S. 307, 318–319.) Our "task is not to resolve credibility issues or evidentiary conflicts, nor is it to inquire whether the evidence might ' " 'be reasonably reconciled with the defendant's innocence.' " ' " (*People v. Gomez* (2018) 6 Cal.5th 243, 278; accord, *People v. Rodriguez* (1999) 20 Cal.4th 1, 12 [reversing court of appeal that reweighed evidence].)

The same standard of review applies to cases where the prosecution relies primarily on circumstantial evidence. (*People v. Vargas* (2020) 9 Cal.5th 793, 820; *People v. Brooks* (2017) 3 Cal.5th 1, 57 [substantial evidence includes circumstantial evidence and reasonable inferences drawn from it].) " 'An

appellate court must accept logical inferences that the [finder of fact] might have drawn from the circumstantial evidence.' [Citation.] 'Before the judgment of the trial court can be set aside for the insufficiency of the evidence, it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the [finder of fact].' " (*People v. Sanghera* (2006) 139 Cal.App.4th 1567, 1573.)

To sustain a conviction for attempted murder, there must be sufficient evidence of the defendant's " 'specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' " (*People v. Canizales* (2019) 7 Cal.5th 591, 602; *People v. Smith* (2005) 37 Cal.4th 733, 739 (*Smith*).) Intent to unlawfully kill and express malice are essentially the same. (*Smith*, at p. 739.) Express malice requires a showing that the defendant either desires the result of death or knows, to a substantial certainty, death will result. (*Ibid.*) Rarely is there " 'direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions.' " (*Id.* at p. 741.)

There is sufficient evidence that Castro intended to kill Pinion. Although Castro frames this incident as mutual combat or self-defense, the evidence supports a different interpretation. Per the video surveillance, Castro crossed a grassy knoll to get to Pinion, who was being dropped off at the hospital. Castro thus went out of his way to confront Pinion. On doing so, Castro almost immediately shot at Pinion. Castro also appeared to shoot at the fleeing Pinion. Castro thus shot at Pinion multiple times. Such purposeful firing of "a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the

shooter had no particular motive for shooting the victim is not dispositive, although again, where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon ' "in a manner that could have inflicted a mortal wound had the bullet been on target" ' is sufficient to support an inference of intent to kill." (*Smith*, *supra*, 37 Cal.4th at p. 742; see also *People v. Thompkins* (2020) 50 Cal.App.5th 365, 384, 396 [manner of shooting— "open[ing] fire" on restaurant patrons after shooter's companion was told to leave—supported intent to kill].)[5]

Castro, however, argues that the evidence supports only the conclusion that he acted in self-defense. As to that defense, the jury was instructed that Castro acted in lawful self-defense if he (1) reasonably believed he was in imminent danger of being killed or suffering great bodily injury, (2) reasonably believed that the immediate use of deadly force was necessary to defend against that danger, and (3) used no more force than reasonably necessary to defend against that danger. (CALCRIM No. 505; see generally *People v. Humphrey* (1996) 13 Cal.4th 1073, 1082–1083.)

To support this defense, Castro relies primarily on Ortega's trial testimony that the two men exchanged words and had a shootout. However, Ortega's testimony was at times confusing or contradictory, because she also could not recall and was not sure if she actually saw Pinion with a gun and was also not sure if there was a mutual shootout. Moreover, other evidence showed that only Castro had a gun. Gonzalez saw only Castro with a

---

[5] Disapproved on other grounds by *In re Lopez* (2023) 14 Cal.5th 562, 584.

8

gun.  Ortega's statement to law enforcement soon after the incident mentioned only one shooter.  The two 911 callers also suggested there was only one shooter:  one caller referred to the "suspect," singular, who was "firing the gun" and the second caller similarly referred to "*a* gunman."  (Italics added.)  And all casings found at the hospital crime scene were fired from the gun recovered at the apartment complex where Castro was arrested.  Evidence that only Castro fired a gun thus undercuts his argument that there was a mutual shootout during which he shot Pinion before Pinion could shoot him.

This evidence, including Ortega's differing statements, was presented to the jury, and the jury clearly rejected that Castro acted in self-defense.  We may not usurp the jury's role by reweighing evidence, reevaluating witnesses' credibility, and resolving credibility issues or evidentiary conflicts to reach a different result.  (See generally *People v. Covarrubias*, *supra*, 1 Cal.5th at p. 890.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

EGERTON, J.

HANASONO, J.

10