Filed 4/10/14  P. v. Stewart CA5

### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DARRELL CEDRIC STEWART,<br><br>    Defendant and Appellant. | F064564<br><br>(Super. Ct. No. BF133087A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John R. Brownlee, Judge.

Ann Hopkins, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Catherine Chatman, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Following jury trial, defendant Darrell Cedric Stewart was convicted of one count of murder and four counts of attempted murder.  A number of gang and firearm use

enhancements were also found true by the jury. Defendant was sentenced to an aggregate term of life without parole and 156 years to life plus 25 years.

On appeal, defendant contends his convictions for the attempted murders of Cynthia Mackey and Larry Declouette must be reversed because there is insufficient evidence he either specifically intended to kill them or they were in the "kill zone." He further contends the gang expert conveyed testimonial hearsay to the jurors in violation of his Sixth Amendment rights. Lastly, defendant argues the trial court erred when it failed to hold a hearing pursuant to Penal Code section 1368 because he was legally incompetent to assist counsel. We reject each of these contentions.

## PROCEDURAL SUMMARY

In an information filed February 15, 2011, the Kern County District Attorney charged defendant with the following: count 1—murder (Pen. Code,[1] § 187, subd. (a)); count 2—conspiracy to commit murder (§ 182, subd. (a)(1)); and counts 3 through 6—attempted murder (§§ 664, 187, subd. (a)). As to counts 1 and 3 through 6, it was alleged the crimes were committed with premeditation and deliberation within the meaning of section 189. As to count 1, a special circumstance was further alleged that the murder was intentional and committed while defendant was an active participant in a criminal street gang within the meaning of section 190.2, subdivision (a)(22). It was further alleged as to all counts that the crimes were committed for the benefit of a criminal street gang within the meaning of section 186.22, subdivision (b)(1), that defendant was a principal, and that at least one principal intentionally and personally used a firearm causing great bodily injury in the commission of the offenses within the meaning of section 12022.53, subdivisions (d) and (e)(1), and that defendant had previously been convicted of a serious felony within the meaning of sections 667, subdivisions (c) through (j), and 1170.12, subdivisions (a) through (e).

---

[1]All further statutory references are to the Penal Code unless otherwise indicated.

2.

On February 18, 2011, defendant entered pleas of not guilty to all counts and denied all allegations. On August 26, 2011, the People's motion to dismiss count 2 in the furtherance of justice was granted.

Following a jury trial, defendant was found guilty of murder and four counts of attempted murder. The jury also found true all sentencing related allegations. In a bifurcated proceeding, the jury also found true the allegations pertaining to defendant's prior conviction for robbery.

On March 16, 2012, defendant was sentenced to life without the possibility of parole in count 1. As to counts 3 through 6, defendant was sentenced to 14 years to life on each count. As to counts 3 through 6, an additional 25 years to life was separately imposed pursuant to section 12022.53, subdivisions (d) and (e)(1), and an additional five years was separately imposed on the five counts pursuant to 667, subdivision (a). All terms imposed were consecutive to one another.

Defendant filed a timely notice of appeal.

## FACTUAL SUMMARY

### The Reunion

On July 4, 2009, Willie Johnson[2] hosted a family reunion at his home in Bakersfield. His two sons, Anthony and Sebastian, had travelled with their families from Texas and San Diego, respectively. Other family members included his father, sisters, brothers, nieces, nephews, and cousins. Willie's good friend Larry Declouette was also in attendance. As many as 100 people attended the reunion. The celebration lasted all day and into the early morning hours of July 5, 2009.

At about 12:30 a.m. on July 5, 2009, a number of reunion attendees, including Sebastian, Anthony, and his wife Christy, were visiting in an area in front of the house between the space where Anthony and Christy's Chevrolet Suburban and Anthony's

---

[2]Because there are several members of the Johnson family mentioned, we will refer to them by their first names. No disrespect is intended.

motorcycle were parked. Shortly after Sebastian and two of his cousins moved to the area in front of the Suburban in order to smoke a "blunt," they noticed three "kids" walking down the street. There was "a girl, a tall guy [in the middle] and another guy." Christy also noticed someone walking down the middle of the street and another individual nearer to the Suburban.

Once the male who had been in the middle of the street was in front of the house facing Christy, and the other male had cleared the Suburban, Christy saw "orange fire" or muzzle flash and heard gunshots. Sebastian also heard the gunshots but thought the noise was fireworks. Then people started screaming and Sebastian saw his cousin Lavar fall to the ground. Christy, who was shot in the left leg above the knee, saw Anthony turn toward her, fall to the ground, and grab his chest.

Christy testified the people who fired at her and her family were Black males. She saw one of the shooters and a woman run from the area afterward. While the males were wearing dark clothing, the female had on light clothing and had colorful braids in her hair. Sebastian also recalled the female having colored hair and the males accompanying her wearing dark clothing.

Meanwhile, Willie and Alfonso Dock, Sr., were inside the house when both heard gunshots they initially presumed to be fireworks. Dock Sr. had been looking out toward the front gate at the time. He observed two flashes of light that originated from the middle of the street. Dock Sr. saw his cousin Anthony fall and another cousin lying on the ground. He also observed someone running away from the house, perhaps two people running away. Once Willie realized the noise he heard had been gunshots, he ran out front. He tried to help his nephew Lavar who was having difficulty breathing. Initially, Willie did not realize his son Anthony had been shot. Others were trying to resuscitate him, but Willie believed his son was already dead.

When police arrived in response to Christy's 911 call, the scene was chaotic. Anthony was found in front of the home, outside the fenced front yard, close to the curb.

4.

Lavar was lying inside the fenced front yard. Medical personnel arrived shortly thereafter to administer aid and take the injured to a local hospital.

Seven shell casings and two bullet fragments were located at the home. Bullet strikes were located to the north of the front door and to the south of the front door between two windows at a height of five feet. The shell casings and bullet fragments recovered from the scene were all fired from the same gun.

Anthony died as the result of a gunshot wound to the chest. The other three gunshot wounds he sustained were not fatal. Christy, Lavar, Cynthia Mackey and Larry Declouette received medical treatment at Kern Medical Center.

### The Events Preceding the Shooting and the Shooting

Sometime after 10:00 p.m. on July 4, 2009, Laquiria Foreman[3] and Christopher Jackson walked by the reunion on their way to a friend's house on nearby Donna Avenue. Jackson said it was a large party; there were about 100 people present. Foreman said hello to an acquaintance she noticed parked on the east curb in front of the house.

When Foreman and Jackson arrived at the Donna Avenue home, Larry Thomas was the only one present. The three of them decided to go to a mutual friend's house. Passing the reunion again, Foreman saw an individual she thought was responsible for a shooting that had occurred the week before. That individual, whose attendance at the reunion was confirmed by another witness, was Alfonso Dock, Jr., or "Gotti." Dock Jr. was a known Eastside Crips gang member, and Foreman noticed him getting out of a nearby vehicle.

Foreman grew up in Eastside Crips territory and still lived in that area with her grandmother when these events transpired. However, in 2008, she began to "hang out"

---

[3]Foreman was also originally charged with murder, conspiracy to commit murder, and four counts of attempted murder. On August 11, 2011, Foreman pled no contest to second degree murder in juvenile court. A condition of her plea required her truthful testimony in the instant proceeding. The remaining counts were dismissed conditioned upon such testimony. Foreman was 15 years old at the time of the crimes.

with friends on the Westside. "Eastsiders" viewed her as a snitch and she had been threatened in the past. Foreman testified she was afraid of Dock Jr. and wanted to return to the Donna Avenue house, so she, Jackson, and Thomas turned around to do so.

About a week before, on June 27, 2009, Foreman, Jackson and a number of other friends were at a party being held on the same street as the Johnson home. About midnight, Foreman was standing in the front yard when she noticed two cars pull up. In a gray Toyota, Shashoni Charles—Foreman's foe and stepsister of Dock Jr.—was "hanging out" of the car's sunroof. Charles indicated she wanted to fight Foreman by "throwing" a gang sign associated with the Spoonie G Crips. Foreman then heard gunshots and someone shouting, "Fuck the Westside" or "Fuck the weak," meaning Westside. No one attending the party was shot, but Jackson scraped his arm when he dropped to the ground to avoid gunfire. While Foreman did not see any of the other occupants of the gray Toyota, the gunshots originated from that vehicle. She later heard that Dock Jr. was responsible; others told her he was bragging about it.

When Foreman, Jackson and Thomas returned to the Donna Avenue house on July 4, Foreman immediately told defendant, who was in the front yard with others, that she had seen Dock Jr. Defendant, whom Foreman knew as "D-Mac," laughed, said "They're not with the functions," and walked off. To say someone is "not with the functions" implies the person lacks backup or the ability to handle his or her business; it is disrespectful.

Later, sometime after midnight, Foreman heard someone say defendant had a gun and was angry. Foreman found defendant and Tremaine Jones in a bedroom talking about the June 27 shooting. Because Foreman had seen Dock Jr. in front of the Johnson house earlier, they decided to take action. She was angry. Foreman admitted knowing defendant was a Westside Crips gang member and that Jones was also. They planned to go to the Johnson house to kill some Eastside Crips gang members in retaliation for the earlier shooting. Defendant stated that if there were older people present, he would start

6.

shooting and then throw the gun to Jones. If, on the other hand, there were young people present, Jones was to start the shooting and then throw the gun to defendant.

Defendant, Jones, and Foreman left the house together on July 5. Defendant and Jones were wearing dark clothing: long black jersey shorts and black T-shirts. Foreman was wearing jeans and a white and gray striped shirt with a purple shirt over it. Foreman's hair was braided and colored with red and purple. They walked together down a few alleys, eventually walking southbound on the street toward the reunion. Foreman was excited and thought it was possible they would get Dock Jr. When the trio arrived near the area, Foreman pointed out the house. Foreman did not see Dock Jr. but did not say anything about it to defendant or Jones. It was understood other people would be targeted. The plan was to "[j]ust shoot them and then run."

As they approached the house, defendant was a few steps ahead of Foreman and Jones. When Foreman saw a black gun in defendant's hand, she ran toward the curb to hide behind a parked car. Defendant was holding the gun in both hands with his arms extended in front of him; he was standing in the middle of the street in front of the house where the reunion was being held. Foreman then heard seven or eight gunshots, but she did not look. Foreman testified she heard two or three shots, then a pause for a few seconds, then another five or six shots. When the shooting stopped, Foreman crawled back and looked toward the house; she saw people running towards a Suburban. She also heard people screaming. Foreman got up and started running southbound toward the house on Donna Avenue. When she got to the Donna Avenue house, defendant and Jones were already there and both had changed clothes.

Foreman learned someone had been killed by watching the early morning news on the television. She talked about it with the others present, saying she felt bad and that it "was messed up." When Foreman was interviewed by police initially, she did not tell the whole truth because she did not want her friends to get in trouble, but she was also afraid if she did not say something, she would go to jail for the rest of her life.

7.

*The Police Interviews*

A number of individuals present at the Donna Avenue house, including defendant, were interviewed by Bakersfield police detectives.

Sergeant Heredia interviewed defendant twice. On the first occasion, the detectives had already spoken with about half of the persons identified as having been at the Donna Avenue house. Defendant was interviewed a second time towards the end of all the interviews. Both interviews were recorded; the second was played for the jury.

Heredia provided false information to defendant in an effort to get defendant to open up about the identity of the shooter. Foreman had advised detectives before defendant's second interview that defendant was present at the scene. But the detectives did not then know the identity of the shooter. They advised defendant they knew the shooter was the other male present, however, hoping defendant would identify that individual.

We have reviewed the transcript of defendant's interview with the detectives. Initially, defendant denied ever leaving the Donna Avenue house between the time he arrived and the visit to a convenience store about 4:00 a.m. on July 5.[4] Later, after being advised by Heredia that police had been told defendant was present at the scene, defendant admitted walking around in the area but did not know what time that would have been. Defendant admitted to being in the company of a light-complected individual when he walked by the party, but denied any shots were fired. At one point, when pressured to get the information off his chest because he would feel better speaking the

---

[4]Defendant's brother and cousin, both of whom were incarcerated for other crimes at the time, testified for the defense. Both testified defendant did not leave the house on Donna Avenue before the 4:00 a.m. trip to the convenience store, and that in fact defendant was asleep on the couch most of the evening and early morning. Both also testified Foreman and Jackson left the house together and then returned about an hour later.

Jackson originally testified he did not see Foreman leave the house. He later testified Foreman left the house after midnight, but he did not see whom she left with. Eventually he admitted telling a detective that Foreman left the house about midnight with defendant.

8.

truth, defendant pointed to his "West Side Gangster Crips Family" tattoo and indicated that was the only thing he cared about.

Eventually defendant admitted to being at the scene when the shots were fired. He estimated eight to ten shots had been fired. Defendant stated the gun was black in color and referred to the gun as a "heart stopper." When asked a second time about what type of gun was used, defendant replied, "The shell casings was over there" and "I said the shell casings was over there." He went on to state that he appreciated the power of a .357, but that was not the type of gun used, and it was not a revolver. Defendant refused to name the other individual present because doing so would amount to "Snitching" and that is against street or "hood" rules. Defendant stated he has been with the "Dub" since he was 13, but said he "ride[s]" for himself. The "WJC" tattoo on his arm is to show others in prison where he is from.

### The Gang Expert Testimony

Eric Lantz, senior officer with the Bakersfield Police Department, testified as a gang expert for the People. In preparation of his testimony, Lantz reviewed investigation reports, police reports, offense reports, field contacts and personal contacts, and booking information concerning the Eastside and Westside Crips. He testified about the history of both gangs and various subsets in the Bakersfield area, their claimed territories, the blue colors adopted by the Eastside Crips and the color black adopted by the Westside Crips, their retaliatory conduct, and the community fear engendered as a result of gang conduct. Specifically, Lantz testified regarding certain predicate offenses committed by members of the Westside Crips, including murder, assault with a deadly weapon, robbery, felonious assault, narcotics sales, and weapons possession.

Lantz testified that, in his opinion, defendant is an active Westside Crips gang member. Defendant's moniker is "D-Mac" and he has a number of gang-related tattoos. Further, in Lantz's opinion, Foreman and Jones are Westside Crips associates.

9.

In response to a hypothetical question posed on facts similar to those present here, Lantz opined that a shooting such as the one described would have been committed for the benefit of and in association with the Westside Crips gang.

## DISCUSSION

### I.    The Evidence is Sufficient to Support the Attempted Murder Convictions

Defendant argues there is insufficient evidence to support his convictions for the attempted murders of Cynthia Mackey and Larry Declouette because there was no testimony shots were fired toward Mackey and Declouette, and there is no evidence with regard to where Mackey and Declouette were in relation to either the shooter or the decedent Anthony Johnson.  We find the evidence sufficient to support these conclusions.

#### A.    Legal Standards

In assessing a claim of insufficiency of the evidence, the reviewing court's task is to review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—evidence that is reasonable, credible, and of solid value upon which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.  It is the jury that must be convinced of a defendant's guilt beyond a reasonable doubt.  If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment.  (*People v. Watkins* (2012) 55 Cal.4th 999, 1019-1020; *People v. Rodriguez* (1999) 20 Cal.4th 1, 11; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317–320; *People v. Johnson* (1980) 26 Cal.3d 557, 578.)

In reviewing a challenge to the sufficiency of the evidence, appellate courts do not determine the facts.  We examine the record as a whole in the light most favorable to the judgment and presume the existence of every fact the trier of fact could reasonably deduce from the evidence in support of the judgment.  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  If the verdict is supported by substantial evidence, a reviewing court must

10.

accord due deference to the trier of fact and not substitute its evaluation of a witness's credibility for that of the fact finder. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The testimony of a single witness—unless physically impossible or inherently improbable—is sufficient for a conviction. (Evid. Code, § 411; *People v. Young* (2005) 34 Cal.4th 1149, 1181.)

An appellate court must accept logical inferences that the jury might have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) Before the judgment of the trial court can be set aside for insufficiency of the evidence, "it must clearly appear that on no hypothesis whatever is there sufficient substantial evidence to support the verdict of the jury." (*People v. Hicks* (1982) 128 Cal.App.3d 423, 429; see *People v. Conners* (2008) 168 Cal.App.4th 443, 453.)

"'The mental state required for attempted murder has long differed from that required for murder itself. Murder does not require the intent to kill. Implied malice—a conscious disregard for life—suffices. [Citation.]' [Citation.] In contrast, '[a]ttempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' [Citations.]" (*People v. Smith* (2005) 37 Cal.4th 733, 739.)

"[I]t is well settled that intent to kill or express malice, the mental state required to convict a defendant of attempted murder, may in many cases be inferred from the defendant's acts and the circumstances of the crime. [Citation.] 'There is rarely direct evidence of a defendant's intent. Such intent must usually be derived from all the circumstances of the attempt, including the defendant's actions….'" (*People v. Smith*, *supra*, 37 Cal.4th at p. 741.)

"An inference of intent to kill drawn on evidence of a purposeful shooting with lethal force under all the attendant circumstances can support a conviction of attempted murder even without evidence of motive. [¶] [T]he act of purposefully firing a lethal weapon at another human being at close range, without legal excuse, generally gives rise to an inference that the shooter acted with express malice. That the shooter had no

11.

particular motive for shooting the victim is not dispositive, although … where motive is shown, such evidence will usually be probative of proof of intent to kill. Nor is the circumstance that the bullet misses its mark or fails to prove lethal dispositive—the very act of firing a weapon '"in a manner that could have inflicted a mortal wound had the bullet been on target"' is sufficient to support an inference of intent to kill.'' (*People v. Smith*, *supra*, 37 Cal.4th at p. 742.)

### B. Analysis

In reviewing defendant's claims of insufficient evidence that he specifically intended to kill Mackey and Declouette or that the two were in the kill zone, we must view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Ochoa*, *supra*, 6 Cal.4th at p. 1206.) We conclude there was sufficient evidence of defendant's intent to kill Mackey and Declouette. Further, we conclude the jury could reasonably find the creation of a kill zone in the area in front of the Johnson home and that Mackey and Declouette were within the kill zone.

#### 1. Specific Intent

First, defendant contends the record lacks substantial evidence he specifically intended to kill Mackey and Declouette. We disagree.

As explained in *Smith*, intent can be inferred. (*People v. Smith*, *supra*, 37 Cal.4th at pp. 741-742.) Here, the evidence established defendant, Jones, and Foreman left a residence on Donna Avenue on July 5, 2009, planning to shoot Dock Jr. in retaliation for a shooting that occurred the week prior. Foreman reported to defendant earlier that evening that she had just seen Dock Jr. at the Johnson home and he was the person responsible for the previous shooting. Defendant and Jones, accompanied by Foreman, planned to walk to the location. It was agreed that if there were older people present, defendant would start shooting and throw the gun to Jones. On the other hand, if younger people were present, Jones would start shooting and then throw the gun to defendant. Further, Foreman testified it was understood amongst the three that people other than

12.

Dock Jr. would be targeted. The plan was to target Dock Jr. and "Eastsiders." Dock Jr. was an Eastsider, and Eastsiders did not belong in Westside territory.

Once the trio neared the Johnson home, defendant was about two steps ahead of Jones. Foreman looked for Dock Jr. but did not see him; she did not say anything to either defendant or Jones. Foreman hid behind a parked car when she saw the gun. Defendant was in the middle of the street holding the gun as he faced the home; he held it in both holds, extending both arms in front of him.

Just after midnight, Christy, Anthony, and others were standing and talking in the area between their Suburban and Anthony's motorcycle. Christy noticed someone in the middle of the street, near the Suburban. She estimated the individual was about 16 feet directly in front of her. A second individual was also near the Suburban, but closer. Those two individuals were about three to four feet apart. Sebastian also testified a number of family members were visiting in the gap between the Suburban and the motorcycle before the shooting occurred.

Foreman heard about seven to eight shots, with a brief pause after the first two or three. Dock Sr. heard two shots, followed by many more. Sebastian heard "a lot" of gunshots. Seven spent shell casings were found in the street in front of the house. Bullet fragments were also found in the gutter.

In this case, there was sufficient evidence of a purposeful shooting with lethal force at close range in the absence of legal excuse, giving rise to an inference the shooter acted with express malice or intent to kill. (*People v. Smith*, *supra*, 37 Cal.4th at p. 742.) The shooter or shooters stood in the middle of the street, directly in front of the Johnson house, and fired into a crowd of reunion attendees. Moreover, there was evidence of a motive: retaliation for an earlier shooting. This evidence is probative of proof of intent to kill. (*Ibid.*) Foreman testified it was understood Dock Jr. and others would be targeted. (*People v. Scott* (1978) 21 Cal.3d 284, 296 [even "uncorroborated testimony of a single witness is sufficient to sustain a conviction, unless the testimony is physically impossible or inherently improbable"].) Viewing this evidence in the light most

13.

favorable to the judgment, we find there was sufficient evidence that defendant intended to kill Mackey and Declouette.

### 2. *Kill Zone*

Defendant also contends there was insufficient evidence Mackey or Declouette were in the kill zone.

The California Supreme Court addressed the kill zone theory in *People v. Bland* (2002) 28 Cal.4th 313. In that case, the court found "[t]he conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them." (*Id*. at p. 329.) Concurrent intent exists

> "'when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.… Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'" (*People v. Bland*, *supra*, 28 Cal.4th at pp. 329–330.)

Here, it is reasonable to infer the kill zone was the area in front of the Johnson house, from the middle of the street where defendant stood with a weapon raised in both hands, across the front yard, to the house itself. The shooter or shooters standing in the middle of the street were facing Christy, who was standing in front of the house. The shooter or shooters intended to target Dock Jr. but knew others might be harmed in the process. From inside the residence, Dock Sr. heard a bullet hit the house. There were

14.

bullet strikes to the residence: north of the front door and south of the front door between two windows.

Fifty to 100 people attended the reunion at the Johnson house on July 4, 2009, and into the early morning hours of July 5. Mackey is Willie's niece and Declouette, while not family, was a close family friend. Both attended the reunion. Sebastian testified his cousin "Cynthia Stokes" was visiting with the group standing in the street near the gate between the Suburban and the motorcycle. It can be reasonably inferred that Sebastian's cousin "Cynthia Stokes" and his father's niece "Cynthia Mackey" are one and the same. Mackey sustained a gunshot wound to the right hand. We find there was sufficient circumstantial evidence from which a rational trier of fact could conclude Mackey was within the kill zone at the time of the shooting.

Declouette did not testify. Sergeant Martin Heredia of the Bakersfield Police Department contacted Declouette in the emergency room at Mercy Hospital on July 5. Other victims from the reunion were being treated in the same emergency room, including Mackey. Heredia observed an injury to Declouette's "right foot between the small toe and the next toe. [Declouette] indicated that he had been shot. The injury that [he] saw was very superficial. If it was a bullet wound, it was more of a grazing wound."

When police arrived on the scene after the shooting, 50 to 60 people remained in the area in front or within the fenced yard of the house. There were several tables and chairs in the front yard; the chairs were scattered, some overturned. Debris and cups were also scattered in the yard. Moreover, Lavar had been struck by gunfire and was lying inside the gated area of the yard. Given Declouette's presence at the reunion, the fact attendees were visiting and partying in the front of the home, and Declouette's claimed gunshot wound, we conclude there was substantial circumstantial evidence from which a rational trier of fact could find he had been present in the kill zone at the time of the shooting.

15.

Moreover, there was evidence the shooting was retaliation directed at Eastside Crips gang member Dock Jr. and that defendant, Foreman and Jones understood others present could be shot.

The size of the zone of harm created by the shooter was a factual issue for the jury based on the nature and scope of the attacks. Considering the shooter's position in the street in front of the home, the number of bullets fired, the bullet strikes found to the north and south of the front door to the home, and the retaliatory motive, the jury could have reasonably concluded the perpetrators intended to kill everyone in front of the home.

In sum, defendant's convictions for the attempted murders of Mackey and Declouette are supported by substantial evidence. Reversal is not warranted.

## II.     Gang Expert Testimony

Next, defendant argues a gang expert may not rely upon and convey to the jury testimonial statements in explaining the basis of his opinion because such testimonial hearsay is a violation of defendant's Sixth Amendment rights. His argument is based upon *Crawford v. Washington* (2004) 541 U.S. 36, 53-54, in which the United States Supreme Court held admission of "testimonial" hearsay violates the confrontation clause unless the declarant is unavailable and the defendant had a prior opportunity to cross-examine the witness. The court did not provide a definitive statement regarding the meaning of "testimonial" hearsay, but one definition mentioned with approval was: the "'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id.* at p. 52.)

The People contend this issue has been forfeited because defendant did not object to the gang expert's testimony on these grounds below. However, we agree with defendant that objection was unnecessary because it would have been futile. In *People v. Thomas* (2005) 130 Cal.App.4th 1202, which the trial court was bound to follow, the

Court of Appeal held the admission of similar hearsay did not contravene *Crawford v. Washington*.

In *People v. Thomas*, a prosecution gang expert testified to establish the elements of the offense of gang participation under section 186.22, subdivision (a). (*People v. Thomas*, *supra*, 130 Cal.App.4th at pp. 1205, 1207.) The expert testified much of his expertise came from statements made by other officers and by gang members. (*Id*. at p. 1207.) His opinion that the defendant was a gang member was based in part on information he found in police reports and statements of gang members who said the defendant was a member. (*Id*. at p. 1206.) The defendant argued the admission of the gang expert's testimony about the statements of other gang members violated the confrontation clause as interpreted in *Crawford v. Washington*. (*People v. Thomas*, *supra*, at p. 1208.)

The Court of Appeal rejected the defendant's argument. It cited *People v. Gardeley* (1996) 14 Cal.4th 605, 618–619, which held that under Evidence Code sections 801 and 802, an expert's opinion can be based on otherwise inadmissible evidence and the expert can testify about that basis if questioned. The *Thomas* court explained this holding survived *Crawford v. Washington*:

> "*Crawford* does not undermine the established rule that experts can testify to their opinions on relevant matters, and relate the information and sources upon which they rely in forming those opinions. This is so because an expert is subject to cross-examination about his or her opinions and additionally, the materials on which the expert bases his or her opinion are not elicited for the truth of their contents; they are examined to assess the weight of the expert's opinion. *Crawford* itself states that the confrontation clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.' [Citation.]" (*People v. Thomas*, *supra*, 130 Cal.App.4th at p. 1210.)

This holding controlled the hearsay issue in this case. A futile objection is not necessary to preserve an issue for appellate review. (*People v. Sandoval* (2007) 41 Cal.4th 825, 837, fn. 4.) Thus, we will consider the merits of the issue.

Officer Lantz testified for the prosecution as an expert on gangs to establish the gang-relatedness of the shooting. Prior to his testimony, Lantz reviewed police reports involving defendant and six others; he was personally involved in those investigations, a total of four cases. Lantz described to the jury, and relied upon, the following information: (1) his own investigations into crimes involving Westside Crips for weapons possession, narcotics sales, murder, assault with a deadly weapon, and robbery, the latter involving defendant; (2) two additional police reports that concerned the "retaliation history" between the Eastside and Westside Crips; (3) personal contacts with defendant while assigned to the patrol unit; (4) booking information regarding defendant; (5) offense reports involving defendant; and (6) street checks or field contacts involving defendant. Lantz also testified about the history of the Eastside and Westside Crips in Bakersfield and the fear experienced by members of the community living within gang territory. The foregoing testimony was proffered by the prosecution to prove the elements of gang-relatedness under section 186.22, subdivision (b).

In asserting that *Crawford v. Washington* means the evidence the expert relied on and testified about should have been excluded and that we should not follow *People v. Thomas*, defendant cites *Williams v. Illinois* (2012) 567 U.S. ___ [132 S.Ct. 2221]. As we shall explain, there was no majority opinion in that case, and defendant does not rely on the case's outcome (finding no constitutional violation). Rather, defendant relies on statements in Justice Kagan's dissenting opinion (joined by three other justices) and in Justice Thomas's opinion concurring in the judgment.

Williams was tried for the crime of rape in a bench trial. A technician from a state laboratory testified she analyzed a blood sample taken from Williams after his arrest and developed a DNA profile. (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2229.) Another prosecution expert testified she compared that profile with a profile developed by a commercial laboratory from semen found on the victim. (*Id*. at pp. 2229–2230.) The expert testified the profile from Williams's blood and the profile from the semen on the victim's body matched. (*Id*. at p. 2230.) No one from the commercial laboratory

18.

testified, and the expert's implication that the data received from the commercial laboratory constituted an accurate profile developed from the semen found on the victim was based on a hearsay statement, namely, the commercial laboratory's report. (*Id*. at pp. 2230, 2235–2236.) There was also chain-of-custody evidence tending to show the state laboratory sent the semen samples taken from the victim's body to the commercial laboratory. (*Id*. at p. 2230.)

Williams argued the expert's implicit affirmation that the results received from the commercial laboratory were a profile of the DNA found on the victim was based on testimonial hearsay and should have been excluded under *Crawford v. Washington*. (*Williams v. Illinois*, *supra*, 132 S.Ct. at pp. 2235–2236.) Justice Alito, in a plurality opinion announcing the judgment of the court joined only by Chief Justice Roberts and Justices Kennedy and Breyer (*id*. at p. 2227), rejected this argument on the grounds like those relied on in *People v. Thomas*, i.e., the hearsay was not admitted to prove the truth of the matter it asserted. (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2236.) That the profile from the commercial laboratory was developed from the semen on the victim was "a mere premise of the prosecutor's question" that the expert "simply assumed … to be true when she gave her answer indicating that there was a match between the two DNA profiles." The import of the expert's statement was only that the two samples she compared matched each other. She was not testifying about where the samples came from, a matter established by other evidence. (*Ibid*.) Since it was a bench trial, there was no danger of the trier of fact failing to understand this. (*Id*. at pp. 2236–2237.)

As an alternative theory, Justice Alito's opinion also stated the commercial laboratory's report, even if statements about it were admitted for the truth of the matter asserted, was not testimonial because it "was not prepared for the primary purpose of accusing a targeted individual." (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2243.) Instead, when the state laboratory sent the semen sample to the commercial laboratory, "its primary purpose was to catch a dangerous rapist who was still at large." (*Ibid*.)

Justice Thomas concurred in the judgment, adding the fifth vote necessary to affirm the lower courts' conclusion. (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2255 (conc. opn. of Thomas, J.).) He rejected, however, the plurality's view that statements from the commercial laboratory's report were not admitted for the truth of the matter they asserted. (*Id*. at p. 2256.) "[S]tatements introduced to explain the basis of an expert's opinion are not introduced for a plausible nonhearsay purpose. There is no meaningful distinction between disclosing an out-of-court statement so that the factfinder may evaluate the expert's opinion and disclosing that statement for its truth," since the factfinder must decide whether the statement is true before evaluating the expert's opinion. (*Id*. at p. 2257.) That other evidence might have established the same fact is not relevant to the constitutional analysis: "The existence of other evidence corroborating the [facts forming the basis of the expert's opinion] may render any Confrontation Clause violation harmless, but it does not change the purpose of such testimony and thereby place it outside the reach of the Confrontation Clause." (*Id*. at p. 2258.)

Justice Thomas agreed with the plurality's result for a different reason: the hearsay was not testimonial, but not for the same reason the plurality thought it was not testimonial. In Justice Thomas's view, "the Confrontation Clause reaches '"formalized testimonial materials,"' such as depositions, affidavits, and prior testimony, or statements resulting from '"formalized dialogue,"' such as custodial interrogation." (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2260.) He concluded the commercial laboratory's report "lacks the solemnity" of these types of materials and, therefore, was not testimonial. (*Ibid*.)

Justice Kagan wrote a dissenting opinion joined by Justices Scalia, Ginsburg, and Sotomayor. (*Williams v. Illinois*, *supra*, 132 S.Ct. at p. 2264 (dis. opn. of Kagan, J.).) Like Justice Thomas, the dissenters concluded that information from the commercial laboratory's report was admitted through the expert for the truth of the matter it asserted. "[W]hen a witness, expert or otherwise, repeats an out-of-court statement as the basis for a conclusion, … the statement's utility is then dependent on its truth." (*Id*. at p. 2268.)

Further, the hearsay was testimonial because the commercial laboratory's report was "in every conceivable respect, a statement meant to serve as evidence in a potential criminal trial." (*Id.* at p. 2275.)

Defendant's argument requires us to combine Justice Thomas's opinion with Justice Kagan's opinion to create Supreme Court authority for the view that the evidence here at issue is testimonial hearsay, the admission of which violated the confrontation clause. Those opinions, however, do not add up to that view. They might add up to five votes for the conclusion that the evidence challenged here was admitted for the truth of the matter asserted, since Justice Thomas and the dissenters agree the evidence disclosed as the basis of an expert's opinion must be true to support that opinion. But there were not five votes for any view of when statements are testimonial. The plurality thought the evidence at issue was not testimonial for one reason, Justice Thomas thought it was not testimonial for a different reason, and the dissenters thought it was testimonial under yet a third rationale. The five justices withholding their votes from the plurality's position might not agree the evidence on which Officer Lantz relied was testimonial hearsay. In light of this, the various opinions in *Williams v. Illinois* do not amount to authority for defendant's position.

In any event, it is not our practice to piece together various nonmajority opinions by Supreme Court justices for the purpose of anticipating what that court's conclusions might be in a case it has not considered. All we can say about *Williams v. Illinois* is that it upheld the admission of the testimony at issue and there was no majority rationale. *Williams* fails to support defendant's position for this reason as well.

We see no adequate reason to depart from the analysis in *People v. Thomas*, and the proper approach, we believe, is to follow *Thomas* unless and until there is authority to do otherwise. To hold that the gang expert's testimony in this case violated the confrontation clause would imply section 186.22 prosecutions as currently practiced are unconstitutional in general, and alternative methods would be hard to find. The expert here was typical in his reliance on myriad items of hearsay from numerous police officers

and gang informants. Presenting all those witnesses at trial would be an obstacle all but insurmountable. We will not impose that obstacle absent clear authority requiring it.

## III. Competent to Assist Counsel

Defendant contends the trial court erred by failing to suspend proceedings because there was substantial evidence he was unable to control his behavior and assist counsel. We do not agree.

### A. Law

Both the due process clause of the Fourteenth Amendment to the federal Constitution and state law prohibit the trial of a criminal defendant while that person is mentally incompetent. (§ 1367, subd. (a); *People v. Elliott* (2012) 53 Cal.4th 535, 582; *People v. Lewis* (2008) 43 Cal.4th 415, 524, overruled on other grounds in *People v. Black* (Mar. 27, 2014, S206928) __ Cal.4th __.; *People v. Murdoch* (2011) 194 Cal.App.4th 230, 236.) A defendant is deemed competent if the defendant has sufficient present ability to consult with defense counsel with a reasonable degree of rational understanding, and has the mental capacity to understand the nature and purpose of the pending proceedings. (§ 1367, subd. (a); *People v. Ary* (2011) 51 Cal.4th 510, 517; *People v. Blair* (2005) 36 Cal.4th 686, 711, overruled on other grounds in *People v. Black*, *supra*, __ Cal.4th at p. __.) A defendant is presumed competent unless it is proved otherwise by a preponderance of the evidence. (§ 1369, subd. (f); *People v. Ramos* (2004) 34 Cal.4th 494, 507; *People v. Ary*, *supra*, at p. 518.) The defendant has the burden of establishing lack of competence. (*Ary*, at p. 518.)

A trial judge must "suspend proceedings and conduct a competency hearing whenever the court is presented with substantial evidence of incompetence, that is, evidence that raises a reasonable or bona fide doubt concerning the defendant's competence to stand trial. [Citations.]" (*People v. Blair*, *supra*, 36 Cal.4th at p. 711; see § 1368, subd. (a); *People v. Ary*, *supra*, 51 Cal.4th at p. 517; *People v. Ramos*, *supra*, 34 Cal.4th at p. 507; *People v. Murdoch*, *supra*, 194 Cal.App.4th at p. 236.)

"Our statutes provide for suspension of criminal proceedings when a doubt as to the defendant's competence arises in the trial judge's mind or when counsel informs the court of counsel's belief the defendant may be incompetent (§ 1368); the appointment of psychologists or psychiatrists to examine the defendant (§ 1369, subd. (a)); and trial of the issue to a jury or to the court (*id.*, subds. (b)-(f)). The defense may waive a jury trial and may even … submit the issue to the court on the written reports of psychologists or psychiatrists. [Citations.]" (*People v. Taylor* (2009) 47 Cal.4th 850, 861–862.)

The court's duty to conduct a competency hearing may arise at any time prior to judgment. (*People v. Rogers* (2006) 39 Cal.4th 826, 847.)

Evidence of incompetence may emanate from several sources, including the defendant's demeanor, irrational behavior, and prior mental evaluations. To be entitled to a competency hearing, a defendant must exhibit more than a preexisting psychiatric condition that has little bearing on the question of whether the defendant can assist defense counsel. (*People v. Rogers*, *supra*, 39 Cal.4th at p. 847.) Counsel's opinion that the defendant is incompetent, although entitled to some weight, does not compel the court to order a competency hearing. (*People v. Lewis*, *supra*, 43 Cal.4th at p. 525; *People v. Blair*, *supra*, 36 Cal.4th at p. 719; *People v. Panah* (2005) 35 Cal.4th 395, 433.)

## B.     Analysis

Defendant argues his behavior, particularly on August 15, 2011, was substantial evidence of his inability to rationally assist counsel and to control his behavior. We disagree.

We have reviewed the record thoroughly and elect not to excerpt all instances concerning defendant's behavior during trial. However, we do believe it beneficial to set forth in detail some of the exchanges that occurred on August 15:

"THE COURT:  All right. The second thing is I understand, [defense counsel], that your client has expressed a desire not to take off his chains today.

"[DEFENSE COUNSEL]:  That's my understanding, Your Honor. I ask—he told me yesterday at the jail when I visited him, and I asked him

23.

this morning, and he reaffirmed his position.  He does not want to take off his handcuffs.

"THE COURT:  All right. Deputy Bales, then, we'll go ahead and leave them on.  [¶] … [¶] … Mr. Stewart, I heard you singing and making comments during the course of my interrogation or questioning with [prospective jurors].[5]

"It's very important that you do not interrupt so we can get this process done.  You asked me what's going to happen, and what will happen is this:  If you continue, we'll have you removed from the courtroom and we'll do the trial without you.

"THE DEFENDANT:  Ooh.  That would be nice.  That will be real nice.  It ain't no fair trial anyway.

"THE COURT:  I'm sorry?

"THE DEFENDANT:  This ain't no fair trial anyway.  Who gives a fuck?

"THE COURT:  I do.

"THE DEFENDANT:  I don't.  Give me a fair trial without fucking around.  How about that?

"THE COURT:  All right.  So are you going to continue to sing and disrupt the proceedings?

"THE DEFENDANT:  Like I said, give me a fair trial.

"THE COURT:  I'm asking you a question.

"THE DEFENDANT:  I just asked you a question.

"THE COURT:  [Defense counsel]—

"THE DEFENDANT:  Don't I have a right to a fair trial?

"THE COURT:  —your thoughts?

---

[5]The transcript of voir dire proceedings indicates defendant interrupted on three occasions by "making mumbling noises."

"THE DEFENDANT:  Don't I have a right to a fair trial?  [¶] Fuck [defense counsel].  He ain't doing his job.  [¶] Don't I have a right to a fair trial?

"THE COURT:  [Defendant], are you going to continue to sing and disrupt the proceedings?

"THE DEFENDANT:  All I have to say is fuck all that.  [¶] Do I have a right to a fair trial?

"THE COURT:  [Bailiff], take him out.

"THE DEFENDANT:  I don't give a fuck.  They're all crooked.

"THE COURT:  It will be a brief recess.

"(A recess was taken.)

"[THE COURT:]  [Defense counsel], would you like an opportunity to speak with your client in private before I bring him back in and ask him a question, or—if he wants to proceed and cooperate in the trial or to be disruptive.  [¶] Your thoughts, Counsel.

"[DEFENSE COUNSEL]:  I don't think I have any influence over him. That's why I didn't try to stop him.  I just thought if I did, it would just make him probably get louder and more disruptive.

"THE COURT:  All right.  For the record, the transportation deputy is here, and, apparently, [defendant] asked the deputy to relay a message to me.  [¶] Deputy, for the record your name, please.

"DEPUTY KENT:  Chris Kent.

"THE COURT:  And Mr. Kent—Deputy Kent, excuse me, you just mentioned to me before we came into court that [defendant] asked you to relay a message to me.

"DEPUTY KENT:  Yes, sir.

"THE COURT:  For the record, what was that message?

"DEPUTY KENT:  For you to fuck off.

"THE COURT:  Well, very well.  Thank you.  [¶] Okay.  Was there anything else he wished to—

"DEPUTY KENT:  The same for Deputy Bales.

25.

"THE COURT: The same for our deputy in Department 6?

"DEPUTY KENT: Yes, sir.

"THE COURT: I see. [¶] Gentleman, what we'll—my plans are—my thought processes is this: We'll bring [defendant] in, and I'll ask him if he wishes to proceed by cooperating in the trial with his attorney and not disrupting the proceedings. [¶] If he says he will, then we'll give him another opportunity. [¶] If he says he will not, we'll exclude him from the trial and proceed. [¶] [Defense counsel]?

"[DEFENSE COUNSEL]: That's fine, Your Honor.

"THE COURT: All right. [Prosecutor]?

"[PROSECUTOR]: I—my only issue is if that is the case, we'll—during the trial will I be allowed to bring him back—because, obviously, proceeding on a jury trial without the individual being here takes away some of the—not necessarily proof, but the fact that the jury won't be able to see the defendant.

"THE COURT: Well, … here's the situation. I am not going to voir dire jurors and have you doing direct examination with him acting the way he was acting this morning. I can't properly conduct a trial in that fashion.

"If you're going to need him at certain points for identification purposes, or things like that, I'm certainly willing to listen to argument and thoughts about bringing him in, back in for a showup types of things, but I'm not going to bring him back here for some sort of circus atmosphere for him to disrupt the proceedings here. I just can't have that.

"[PROSECUTOR]: Then my only question would be is it—how is it going to be explained to the jury in that the individual is now gone, and then perhaps people that have seen whatever on TV or would think that we are proceeding in an unfair fashion because we're not allowing someone to be here. So will it be explained?

"THE COURT: Well, I'm certainly not going to bring him in, you know, with a Dr. Lecter, Silence of the Lambs mask or have him brought in on the back of a gurney or something like that with a ball taped in his mouth or something. I'm not going [to] do that. That would make it ten times worse.

"I think we can simply explain to the jury that—I don't know. I've never really had a situation come up this early in the trial before we even got the panel.

26.

"I've had to proceed during the course of the trial where the jury saw it happen for themselves.

"I think we'll need to discuss that and come up with something that we can tell the jury that you're all comfortable with. But at this point he's forced my hand. I'm going to have to conduct the jury trial in an orderly fashion. Certainly can't do it with him in here acting that way.

"So my thought is to bring him back in and have a short question and answer with him. I have a gut feeling how it's going to go, based on the statement that was relayed through the transportation deputy, but I think this is the way we need to go. [¶] … [¶]

"[Defendant], I'm going to ask you, sir, are you going to be able to sit with your attorney and cooperate in this trial without causing a disturbance or continue to act like you were this morning, sir?

"THE DEFENDANT:  I think that's my right.

"THE COURT:  Which one is your right?

"THE DEFENDANT:  Sitting in here.

"THE COURT:  Not necessarily, no. [¶] So I'm asking you if you're going to sit in here, are you going to do it without creating a disturbance?

"THE DEFENDANT:  I think I can do that.

"THE COURT:  You think you can—

"THE DEFENDANT:  Yeah. I think I can.

"THE COURT:  —or are you going to?

"THE DEFENDANT:  I think I can do that.

"THE COURT:  Any more outbursts, we'll take you out. Okay?

"THE DEFENDANT:  Uh-huh.

"THE COURT:  Forever. For the rest of the trial.

"THE DEFENDANT:  All right.

"THE COURT:  So can you maintain—

"THE DEFENDANT:  Sure can.

27.

"THE COURT:  Let me ask you a question, sir.  [¶] Can you maintain in here without causing a disturbance?

"THE DEFENDANT:  I said I could try.

"THE COURT:  I don't know if try is going to do it.  I need you to be able to tell me that you're going to be able to do it.

"THE DEFENDANT:  I guess I won't be in here, then.

"THE COURT:  You won't be able to do it?

"THE DEFENDANT:  I said I'll try.

"THE COURT:  Well, I need a yes or a no answer, sir.

"THE DEFENDANT:  I just told you I could try.

"THE COURT:  I need a yes or a no.

"THE DEFENDANT:  Let me say it again.  I can try.

"THE COURT:  You can try and do what?

"THE DEFENDANT:  I can try and be with you all civilized.

"THE COURT:  What makes you feel that you won't be able to do it?

"THE DEFENDANT:  I don't know.  I don't know.  [¶] If you were sitting in that chair fucking fighting for your life, you don't know what you might do.  That's why keep my handcuffs on.  Ain't no telling.

"THE COURT:  So you're going to keep your handcuffs on because there's not—no telling what you'll do to me?

"THE DEFENDANT:  You or anybody in this courtroom.

"THE COURT:  So you feel you're a threat to the people in this courtroom?

"THE DEFENDANT:  I don't know.  This is my life.

"THE COURT:  Why do you want to keep the handcuffs on?

"THE DEFENDANT:  Who knows.  Only time will tell.

"THE COURT:  Do you know?

28.

"THE DEFENDANT:  No. I got a lot of personalities.

"THE COURT:  So it's your belief you feel you should have your handcuffs on because you don't know how you are going to react—

"THE DEFENDANT:  I don't know.

"THE COURT:  —is that correct?  [¶] Do you want to be in here for your trial?

"THE DEFENDANT:  I just said yes.

"THE COURT:  Can you sit in here and cooperate with your lawyer?

"THE DEFENDANT:  I said I was going to try.

"THE COURT:  Without causing a disruption?

"THE DEFENDANT:  I said I was going to try.

"THE COURT:  You tell me you're going to try, we might get another witness in here and you decide that you don't like what—or another juror and you don't like what the juror is doing or saying and you start interrupting.  We can't have that.

"THE DEFENDANT:  I'll do—

"THE COURT:  So if you tell me you can do it, we'll let you stay.

"THE DEFENDANT:  I can do it.

"THE COURT:  Okay.  Very good."

Defendant's assertion there was evidence he was unable to control his behavior and assist counsel is unpersuasive.  Rather, the record establishes defendant chose to be obstreperous, obstinate, and uncooperative.  As noted in *People v. Mai* (2013) 57 Cal.4th 986, 1034, the California Supreme Court has "made clear that an uncooperative attitude is not, in and of itself, substantial evidence of incompetence."

More specifically, that court recently held as follows:

"The defendant's demeanor and irrational behavior may also, in proper circumstances, constitute substantial evidence of incompetence. [Citation.]  However, disruptive conduct and courtroom outbursts by the

29.

defendant do not necessarily demonstrate a present inability to understand the proceedings or assist in the defense. [Citations.]

"Counsel's assertion of a belief in a client's incompetence is entitled to some weight. But unless the court itself has declared a doubt as to the defendant's competence, and has asked for counsel's opinion on the subject, counsel's assertion that his or her client is or may be incompetent does not, in the absence of substantial evidence to that effect, require the court to hold a competency hearing. [Citations.]

"By the same token, and absent a showing of 'incompetence' that is 'substantial' as a matter of law, the trial judge's decision not to order a competency hearing is entitled to great deference, because the trial court is in the best position to observe the defendant during trial. [Citation.] '"An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper." [Citations.]' [Citation.]" (*People v. Mai*, *supra*, 57 Cal.4th at p. 1033.)

Here, defendant's conduct throughout the proceedings appears to amount to disruptive conduct or outbursts meant to delay or obstruct. When the trial court asked counsel about the conduct, defense counsel never expressed a belief his client was incompetent or unable to assist in his defense. To the contrary, as defense counsel explained, his tactic was to ignore defendant's conduct because counsel thought if he tried to stop it, defendant would "probably get louder and more disruptive." A short time later, when the trial court stated that if defendant were to continue to disrupt proceedings, the trial court intended to conduct the trial in defendant's absence, defense counsel agreed with the trial court's stated intention. Again, he did not express any concern regarding defendant's ability to assist in the defense of the action. Neither did the trial court ever express any doubt or concern of its own.

To the degree defendant argues his conduct below is itself sufficient to mandate further inquiry into incompetence, we disagree. Defendant's conduct does not begin to conform to the conduct observed in either *Drope v. Missouri* (1975) 420 U.S. 162 or *Pate v. Robinson* (1966) 383 U.S. 375. In *Drope*, the Supreme Court concluded a sufficient doubt as to the petitioner's competence to stand trial had been raised by a combination of

(1) a pretrial psychiatric report concluding the petitioner suffered from "'[s]ociopathic personality disorder, sexual perversion,'" borderline mental deficiency, and chronic anxiety reaction with depression (*Drope*, at p. 164, fn. 1); (2) the petitioner's wife's testimony that the petitioner had tried to strangle her a few days before he was to be tried for forcibly raping her (*id*. at p. 166); and (3) the petitioner's suicide attempt during trial (*id*. at pp. 167, 169). No similar evidence was before the trial court in this case.

In *Pate*, defendant Robinson killed his common law wife during an irrational episode. He had a psychiatric history of severe disturbances and bizarre behavior following a childhood accident, suffered from hallucinations and delusions, had been committed to a psychiatric hospital, attempted suicide after killing his toddler son, and at the trial four witnesses testified he was insane. (*Pate v. Robinson*, *supra*, 383 U.S. at pp. 376-384.) Again, no similar evidence was before the trial court here.

Moreover, unlike the defendant in *Murdoch*, defendant does not have a known psychiatric history requiring prescription medication to treat and control severe mental illness. (*People v. Murdoch*, *supra*, 194 Cal.App.4th at pp. 233-235.) Regarding defendant's wish to remain handcuffed during voir dire and his reference to having "multiple personalities," our Supreme Court has confirmed "that more is required to raise a doubt of competence than the defendant's mere bizarre actions or statements, with little reference to his ability to assist in his own defense. [Citation.]" (*People v. Medina* (1995) 11 Cal.4th 694, 735.) In this case, no evidence was presented to the trial court linking defendant's disruptive behavior with a mental disorder preventing him from either understanding the proceedings or assisting counsel in presenting his defense.

A careful review of this record shows defendant's obstinate, obstreperous, and uncooperative behavior. It does not reveal substantial evidence of defendant's inability to rationally assist counsel. Hence, there was no error and reversal is not required.

## IV.    The Firearm Use Enhancement on Count 1

The People assert the trial court erred in staying the firearm use sentencing enhancement on count 1. More specifically, the People contend the trial court believed it

was precluded, pursuant to section 654, from imposing the firearm use enhancement (§ 12022.53, subds. (d) & (e)(1)), where the jury's true finding of the special circumstance of intentional murder committed by an active participant in a criminal street gang resulted in imposition of life without the possibility of parole (§ 190.2, subd. (a)). Thus, the People ask us to amend the abstract of judgment to omit or delete the stay imposed. On the other hand, defendant maintains the trial court properly stayed the firearm use enhancement associated with count 1.

## A.    The Relevant Sentence Imposed

The trial court imposed the following sentence in light of defendant's conviction in count 1:

> "[THE COURT:]  As to Count 1, the term prescribed by law is life without the possibility of parole because of the special allegation pursuant to … Section 190.2(a)(22) and the enhancement pursuant to … Section 12022.53(d) and (e) involve the same element.  [It will b]e ordered that the enhancement be stayed pursuant to … Section 654, [defense counsel].

> "[DEFENSE COUNSEL]:  Thank you.

> "THE COURT:  Now, the duel [*sic*] issues, the gang enhancement pursuant to … Section 186.22(b)(1), that would be punished under … Section 186.22(b)(5).  It is moot as to the punishment and this count exceeds 15 years.  [¶] … [¶]

> "Therefore, as to Count 1, violation of … Section 187(a), with a violation of … Section 189, and … 190.2(a)(22), and … 667(e), probation is denied.  Defendant is to be sentenced to the Department of Corrections for the terms prescribed by law of life without the possibility of parole. Said sentence to be enhanced by 25 years to life pursuant to Section 12022.53(d) [and] (e)(1) ….  Punishment for that sentence will be stayed pursuant to Section 654 … until the successful completion of the sentence imposed above and permanently thereafter.  Said sentence is to be enhanced by five years pursuant to Section 667(a) …."

## B.    Analysis

The base term of defendant's sentence resulted from the jury's true finding on a special circumstance allegation pursuant to section 190.2, subdivision (a)(22).  It provides for punishment by "death or imprisonment in the state prison for life without the

32.

possibility of parole" if the defendant "intentionally killed the victim while [he] was an active participant in a criminal street gang … and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a).) Where a gang-related murder involves the use of a firearm, further imposition of an enhancement pursuant to section 12022.53 may be warranted. (*People v. Shabazz* (2006) 38 Cal.4th 55, 70.)

Section 654[6] prohibits separate punishment for multiple offenses arising from the same act or from a series of acts constituting an indivisible course of criminal conduct. (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507; *People v. Latimer* (1993) 5 Cal.4th 1203, 1216.) "'Whether *a course of criminal conduct* is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*People v. Rodriguez*, *supra*, at p. 507; accord, *People v. Lewis*, *supra*, 43 Cal.4th at p. 519.)

In *People v. Ahmed* (2011) 53 Cal.4th 156, the California Supreme Court determined that sentence enhancements are indeed subject to section 654 if the specific sentencing statutes themselves do not otherwise state whether more than one enhancement may be imposed. (*Ahmed*, at p. 159.) "Only if the specific statutes do not provide the answer should the court turn to section 654." (*Id*. at pp. 159–160, 163.) If section 654 does apply, "the analysis must be adjusted to account for the differing natures of substantive crimes and enhancements." (*Ahmed*, at p. 160.) "[E]nhancement provisions do not define criminal acts; rather, they increase the punishment for those acts. They focus on *aspects*[7] of the criminal act that are not always present and that warrant

[6]Subdivision (a) of section 654 provides: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. An acquittal or conviction and sentence under any one bars a prosecution for the same act or omission under any other."

[7]The court chose the word "aspect" to avoid confusion with statutes containing the words "circumstances," (e.g., § 190.2) factor, or element. (*People v. Ahmed*, *supra*, 53 Cal.4th at p. 163, fn. 3.)

additional punishment." (*Id*. at p. 163.) "[W]hen applied to multiple enhancements for a single crime, section 654 bars multiple punishment for the same *aspect* of a criminal act." (*People v. Ahmed*, *supra*, at p. 164.)

Turning first to the statutory language, section 190.2, subdivision (a)(22) authorizes a defendant to be sentenced to "death or imprisonment in the state prison for life without the possibility of parole" if "[t]he defendant intentionally killed the victim while the defendant was an active participant in a criminal street gang … and the murder was carried out to further the activities of the criminal street gang." Section 12022.53, subdivision (e) subjects a nonshooting principal to the same 25-year-to-life enhancement imposed on a shooter whose personal discharge of the firearm caused great bodily injury or death (§ 12022.53, subd. (d)), when the nonshooter has violated section 186.22. In this case, the jury found true the allegation under section 186.22, subdivision (b)(1) that the murder had been "committed for the benefit of, at the direction of, or in association with [a] criminal street gang," thus triggering application of section 12022.53, subdivision (e).

Although the Courts of Appeal have recognized the requirement of section 190.2, subdivision (a)(22) that the murder must have been "carried out to further the activities of the criminal street gang" "substantially parallels the language of section 186.22, subdivision (b)(1)" (see, e.g., *People v. Carr* (2010) 190 Cal.App.4th 475, 488), nothing in the language of either section suggests it is improper to impose both enhancements in the case of a gang murder accomplished by a firearm. The Legislature could easily have said so if it wished to preclude application of both enhancements, as it did in section 12022.53, subdivision (e)(2), which bars imposition of an additional gang enhancement under "Chapter 11 (commencing with Section 186.20) of Title 7 of Part 1" unless the defendant "personally used or personally discharged a firearm in the commission of the offense." Subdivision (e)(2) of section 12022.53 does not bar imposition of the additional enhancement here because the trial court sentenced defendant to life without the possibility of parole in count 1 based upon section 190.2, subdivision (a)(22), not

section 186.22 or any other provision contained in chapter 11 of title 7 of part 1 of the code. Rather, section 190.2 falls within chapter 1 of title 8 of part 1 of the code.

Section 190.2, subdivision (a)(22) prescribes an alternate penalty for gang-related, special-circumstance murder, not a sentence enhancement. (See *People v. Jones* (2009) 47 Cal.4th 566, 576; *People v. Bright* (1996) 12 Cal.4th 652, 656, fn. 2, disapproved on another ground in *People v. Seel* (2004) 34 Cal.4th 535, 550, fn. 6.) Nonetheless, for at least some purposes the term "enhancement" may include not only sentence enhancements but also alternate penalty provisions. (See *People v. Brookfield* (2009) 47 Cal.4th 583, 593-594.) We need not decide whether this is one such case because, in either event, section 654 does not bar imposition of both the life-without-the-possibility-of-parole term under section 190.2, subdivision (a)(22), and the firearm-use enhancement under section 12022.53, subdivisions (d) and (e)(1).

Even considering the relevant "aspect" of the enhancements for purposes of an analysis under section 654, we would reach the same result. The gang-murder special circumstance applies whenever a murder is carried out for a gang purpose by whatever means the gang chooses. The section 12022.53, subdivisions (d) and (e), firearm-use enhancement applies when the gang-related crime is accomplished through the use of a firearm. Therefore, we find one enhancement focuses on the purpose of the underlying murder, while the other focuses on the means the gang uses to accomplish the crime. Because the two separate enhancements differ in aspect, sentencing under both enhancements does not violate section 654. As a result, the trial court erred in staying imposition of the 25 years to life enhancement provided for in section 12022.53, subdivisions (d) and (e)(1).

For the foregoing reasons, we will modify the sentence to lift the section 654 stay and direct the trial court to prepare an amended abstract of judgment.

## DISPOSITION

The judgment is modified to lift the section 654 stay on the firearm use enhancement on count 1, and the clerk of the court is directed to prepare an amended

35.

abstract of judgment reflecting this modification and forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

                                             _____

                                                                 PEÑA, J.

WE CONCUR:


_____

CORNELL, Acting P.J.


_____

GOMES, J.