Filed 12/31/15  P. v. Boatman CA1/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　　Plaintiff and Respondent,<br><br>v.<br><br>JESSIE DARRIN BOATMAN,<br><br>　　　　Defendant and Appellant. | A142348<br><br>(Sonoma County<br>Super. Ct. No. SCR615197) |

Defendant Jessie Darrin Boatman was convicted of assault by means of force likely to produce great bodily injury based upon evidence that he strangled his girlfriend. On appeal, he claims the evidence was insufficient to establish that the force he applied while strangling his girlfriend was likely to produce great bodily injury.  We reject this contention and affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

Jane Doe and defendant began a dating relationship in September 2011.  Shortly after midnight on March 4, 2012, defendant went to Doe's apartment in Healdsburg, where Doe was watching a movie with her 12-year-old son.  After the movie ended, Doe and defendant went to her bedroom while her son remained in the living room.

While Doe and defendant were in her bedroom, he began questioning her about a phone call she had received months earlier.  Doe did not remember the call but acknowledged that the identity of the caller had been an issue between them.  As defendant became upset and raised his voice, Doe told him that she did not want her son in the next room to overhear and think that defendant's behavior was an appropriate way

1

for men to act.  Defendant became more argumentative and told Doe that maybe her son needed to know that his mother was a whore.

Doe was sitting on the bed.  When she tried to stand up for herself and respond to defendant, defendant told her he felt like punching her.  He rushed at her and, using both hands, grabbed her around the neck with "a lot" of force.  They ended up on the floor with defendant continuing to squeeze her neck with such force that, at times, Doe was unable to breathe.  Doe tried to get defendant off of her.  Doe later told the police that she was terrified at the time and thought she might die.

Defendant spent a total of about "five minutes or a little more" strangling Doe on the bed and the floor.  When he finally let go, he continued to demand that Doe reveal the identity of the person whom she had spoken to months earlier.  Doe decided to tell defendant "what he wanted to hear" so that he would stop hurting her, so she told him that she had been talking to her son's father on the phone.  Defendant told her that he could have stabbed her.  He said he was sorry and that he just wanted her to tell the truth.  He also told Doe that she had marks on her neck, which Doe observed in the mirror.  She also had a scratch above her left eyebrow.

Sometime after 3:00 a.m., defendant left and Doe locked the door.  Doe's son urged her to call the police, and told her that he would call the police himself if defendant ever returned.  Doe lay down on the couch with her son for a few hours.  Her throat was "tight and scratchy" when she swallowed, and her neck was swollen.  She took pictures of her injuries and called the YWCA for guidance the following afternoon.  She was advised to seek a medical evaluation since serious throat injuries often take some time to manifest themselves.

Doe went to the emergency room at Healdsburg District Hospital on the afternoon of March 4, 2012.  An emergency room physician, Dr. Mark Mills, examined her and was "struck [by] the marks on her neck" that "appeared to be finger marks that had to be forcefully applied for long enough duration and force to cause that type of redness and contusion."  Doe was in "moderate pain and was scared and anxious."  Dr. Mills gave Doe ibuprofen.  After the ibuprofen failed to alleviate the pain and swelling, he gave her

2

an injection of Toradol, which he described as a "strong anti-inflammatory and pain medicine . . . ." Dr. Mills saw no fractures of the windpipe or obvious nerve damage upon conducting a neurological examination. He diagnosed the injuries as soft tissue injuries. At the hospital, a police officer took pictures of Doe's injuries. Doe appeared to be "concerned, stressed, [and] worried" as she told the officer what had happened.

The following day, March 5, 2012, defendant called Doe to apologize and told her he still loved her. That same day, a police officer came to Doe's home and asked to take pictures of her injuries. Doe appeared upset and confused. She refused to provide additional statements or allow photographs of herself. Doe did not know how to feel and ended the relationship, although at some point she reestablished contact with defendant and claimed she continued to care about him.

Two days after the incident, on March 6, 2012, Doe returned to the hospital complaining of neck pain, numbness, difficulty swallowing, anxiety, and some tingling in her lips. She was seen in the emergency room by Dr. Lawrence Gettler. According to Dr. Gettler, a "significant amount of force" had been applied to Doe's neck to result in her injuries. Dr. Gettler prescribed oral ibuprofen to address both the swelling and the pain. On March 8, 2012, a police officer took additional photographs of Doe and her neck injuries.

On April 16, 2014, the Sonoma County District Attorney filed a third amended information charging defendant with assault by means of force likely to produce great bodily injury (Pen. Code,[1] § 245, subd. (a)(4)). It was further alleged that defendant intended to cause great bodily injury. (§§ 667, subd. (e)(2)(C)(iii) and 1170.12, subd. (c)(2)(C)(iii).) The district attorney also alleged that defendant had suffered three prior serious or violent felony convictions that qualified as both strikes under the Three Strikes Law (§ 1170.12) and "prison priors" under section 667.5, subdivision (b).

Defendant waived his right to a jury trial. A court trial commenced in April 2014. Among the witnesses testifying on behalf of the prosecution were Doe, an expert on

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

3

intimate partner violence, police officers who investigated the incident or questioned Doe, the two emergency room doctors who attended to Doe, and Diana Emerson, a forensic nurse practitioner who testified as an expert in the mechanics of strangulation and injuries related to domestic violence. Emerson testified that she felt "very strongly" that defendant's actions could have caused grave bodily injury to Doe.

The court found defendant guilty of assault by means of force likely to produce great bodily injury and found all the prior conviction allegations true. However, the court returned a finding of not true with respect to the enhancement charging defendant with intent to cause great bodily injury.

The court sentenced defendant to an aggregate prison term of 11 years, consisting of the aggravated four-year term for the assault conviction (§ 245, subd. (a)(4)), doubled to eight years under section 1170.12, subdivision (c)(2)(C) as a result of the prior strikes, plus three consecutive one-year terms associated with each of the "prison prior" convictions (§ 667.5, subd. (b)). Defendant timely appealed.

## DISCUSSION

Defendant's sole claim on appeal is that the evidence was insufficient to establish that the force applied during the assault was likely to produce great bodily injury. He argues that, at best, the force applied was likely to cause—and in fact did cause— "moderate harm." Consequently, he urges that we reduce his conviction to misdemeanor assault (§ 240) or misdemeanor battery (§§ 242 or 243, subd. (e)(1)). As we explain, there was substantial evidence to support the felony conviction.

Section 245, subdivision (a)(4) sets forth the punishment for "[a]ny person who commits an assault upon the person of another by *any means of force likely to produce great bodily injury . . . .*" (Italics added.) "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1066.) Assault with force likely to cause great bodily injury does not require the victim to have actually suffered great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1028.) Rather, "[o]ne may commit an assault without making actual physical contact with the person of the victim; because the statute focuses

4

on . . . force *likely* to produce great bodily injury, whether the victim in fact suffers any harm is immaterial." (*Ibid.*) " ' "*Likely*" means "probable" or . . . "more probable than not." ' [Section 245] 'prohibits an assault by means of force *likely* to produce great bodily injury, not the use of force which does *in fact* produce such injury [and though] the results of an assault are often highly probative of the amount of force used, they cannot be conclusive.' " (*People v. Russell* (2005) 129 Cal.App.4th 776, 787, fns. omitted.)

"[W]hether the force used by the defendant was likely to produce great bodily injury is a question for the trier of fact to decide." (*People v. Sargent* (1999) 19 Cal.4th 1206, 1221.) Section 245 does not define "the means to be used as requisite to a conviction. Its language 'is a general and comprehensive term designed to embrace many and various means and forces.' " (*People v. Pullins* (1950) 95 Cal.App.2d 902, 904.) "That the use of hands or fists alone may support a conviction of assault 'by means of force likely to produce great bodily injury' is well established . . . ." (*People v. Aguilar, supra,* 16 Cal.4th at p. 1028.)

In assessing the sufficiency of the evidence, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'The test on appeal is whether substantial evidence supports the conclusion of the trier of fact, not whether the evidence proves guilt beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.) It is not our role to assess the credibility of the witnesses; we must draw all reasonable inferences and resolve all conflicts in favor of the judgment. (See *People v. Snow, supra,* at p. 66; *People v. Smith* (2005) 37 Cal.4th 733, 739.) Reversal is not warranted "unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' " (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Here, the physical evidence and testimony at trial were sufficient to support the trier of fact's determination beyond a reasonable doubt that the force defendant inflicted

was likely to result in great bodily injury. Doe's testimony, supported by photographs of her injuries, was that defendant strangled her hard enough to prevent her from breathing at various times and with enough force to leave marks on her neck. When she tried to loosen his grasp, he would retighten his grip on her neck.

Diana Emerson, the forensic nurse practitioner who testified as an expert on the mechanics of strangulation, opined that Doe's soft-tissue injuries, the pattern of bruising visible immediately after the attack, and Doe's reports of significant pain that worsened when she swallowed, showed that the force applied by defendant was strong enough to cause grave bodily injury. Emerson noted that inflammation from strangulation through repeated pressure can be lethal, with the risk of dying lasting "for up to 24 to 36 hours after the strangulation event . . . ." Although a strangulation victim may experience injury only to "soft-tissue structures" in the neck, there is still a risk of serious injury or death because swelling in the neck may "obstruct and occlude the airway."

Emerson testified that defendant had repeatedly applied and released pressure to Doe's neck "to where the brain cells were intimately not getting enough oxygen and the blood flow was being interrupted, and that repetitive type of strangulation injury can lead to more neurological deficits down the line . . . ." Indeed, when Doe returned to the emergency room for treatment two days after she was strangled, she exhibited symptoms, such as numbness on one side of her face and tingling on her lips, that was consistent with injury to the cranial nerves. Emerson also testified that how an injury heals— particularly bruising—is not an accurate measure of the seriousness of the injuries.

The two emergency room physicians who treated Doe confirmed the extreme nature of the force applied to Doe and the concern that she might have suffered serious injury as a result. Dr. Willis, the physician who treated Doe the day following the strangulation, testified that "it would take a large amount of force for a period of time to cause" the type of contusions and marks he observed on Doe. Dr. Gettler, the physician who treated Doe two days after she was strangled, noted that Doe had returned with numbness in her lips and tightness in her throat. He prescribed an anti-inflammatory not just for pain but also to decrease the swelling. Dr. Gettler concluded that "[f]or the

6

patient to have that amount of swelling and contusions and bruising around the neck did indicate to me that there was a significant amount of force that had been applied to that area to cause those injuries."

The analysis in *People v. Corvino* (1980) 100 Cal.App.3d 660 is instructive. There, the defendant argued "as a matter of law [that] an assault which produces only momentary interruption of breathing and slight reddening of the skin without any substantial damage to bodily tissues is not an assault by means of force likely to produce great bodily injury." (*Id.* at p. 667.) The Court of Appeal acknowledged that the victim had likely not suffered great bodily injury but rejected the defendant's claim, finding that "an injury is not an element of the crime, and the extent of any injury is not determinative." (*Ibid.*) The court held that the evidence of the victim's symptoms supported "a reasonable inference by a rational trier of fact that the force of appellant's assault, the choking, was likely to produce a serious injury." (*Id.* at pp. 667–668.) A deputy had testified that he witnessed the defendant squeezing the female victim's neck in a vehicle, causing her to turn red and gasp for air. (*Id.* at pp. 665–666.) The victim, who was shaken and crying after the deputy pulled her from the vehicle, exhibited redness from the assault and later complained of neck pain. (*Id.* at p. 665.) The appellate court concluded: "If appellant is suggesting that he didn't understand that throttling a person is likely to result in great bodily injury, his lack of understanding snaps the bounds of credulity." (*Id.* at p. 668.)

In this case, likewise, there was ample evidence that the force used by defendant in strangling Doe was likely to result in great bodily injury, even though she did not, in fact, suffer life-threatening injuries. Defendant emphasizes that Doe did not immediately seek medical help, that the bruising went away within a week, and that Doe did not incur significant neurological damage but only suffered "superficial nerve irritation." However, merely because Doe successfully avoided suffering serious and lasting injuries does not negate the fact that the force applied by defendant made it probable—though not certain—that she could incur great bodily injury.

Defendant cites a number of cases for the proposition that the presence or absence of injury is highly probative of whether the force applied was likely to cause significant injury. These cases do not change our conclusion. In one of the cases relied upon by defendant, *People v. Duke* (1985) 174 Cal.App.3d 296, the defendant put the victim in a momentary headlock that allowed her to breathe and scream, and "released her almost immediately" from this hold. (*Id.* at pp. 302–303.) The victim, moreover, did not describe herself as having been choked or strangled. (*Id.* at p. 302.) While the court concluded that the defendant *could* have applied enough force to produce great bodily injury, the force *actually* applied was not likely to produce serious harm. (*Id.* at p. 303.) Here, by contrast, there was physical evidence as well as testimony establishing that defendant actually used significant force in strangling Doe.

In two other cases relied upon by defendant, *In re Brandon T.* (2011) 191 Cal.App.4th 1491, and *People v. Beasley* (2003) 105 Cal.App.4th 1078, the focus was upon whether a particular object was used as a deadly weapon, with emphasis on whether the injuries suffered by the victim showed that the object was used in manner likely to produce great bodily injury. The cases stress that the objects—a butter knife and a broomstick—had the capacity to inflict great bodily injury but were not used in a manner that made it likely serious injury would result. (*In re Brandon T., supra,* at pp. 1497–1498; *People v. Beasley, supra,* at pp. 1087–1088.) In both cases, the injuries were less severe and problematic than those suffered by Doe. In *Brandon T.*, the victim had welts and a small scratch on his cheek as a result of the defendant trying to cut him with a butter knife. (*In re Brandon T., supra,* at p. 1497.) In *Beasley*, the victim suffered bruises on her arms and shoulders as a result of being struck with a broomstick. (*People v. Beasley, supra,* at p. 1088.) As the testimony established in this case, bruising and soft-tissue inflammation resulting from strangulation can lead to serious injury and even death because of nerve damage and obstruction of the victim's airway. Bruising and welts on a person's cheek or arms do not raise the same concerns.

Considering the record in the light most favorable to the judgment, we conclude that substantial evidence supports defendant's felony assault conviction.

**DISPOSITION**

The judgment is affirmed.

_____
McGuiness, P.J.

We concur:


_____
Pollak, J.


_____
Jenkins, J.


*People v. Boatman*, A142348

10